EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Indulac<br><br>Peticionaria<br><br>v.<br><br>Central General de Trabajadores<br><br>Recurrida | Certiorari<br><br>2021 TSPR 78<br><br>207 DPR _____ |

Número del Caso: CC-2019-887

Fecha: 4 de junio de 2021

Tribunal de Apelaciones:

    Panel X

Abogado de la parte peticionaria:

    Lcdo. Fernando A. Baerga Ibáñez

Abogado de la parte recurrida:

    Lcdo. Luis A. Zayas Monge

Abogados de la parte *Amicus Curiae*:

**Oficina de la Procuradora de la Mujer**
Lcda. Lersy G. Boria Vizcarrondo
Lcda. Madeline Bermúdez Zanabria
Lcda. Mariamelia Sueiro Álvarez
Lcda. Natalie Díaz Rodríguez
Lcdo. Harold Díaz Toribio

Materia: Derecho Constitucional y Derecho Laboral - La violación al derecho a la intimidad por parte de un empleado a otro en el contexto laboral es razón suficiente para su despido como primera falta grave al amparo de la Ley Núm. 80 de 30 de mayo de 1976.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| INDULAC<br><br>Peticionaria<br><br>v.<br><br>CENTRAL GENERAL DE TRABAJADORES<br><br>Recurrida | CC-2019-887 | *Certiorari* |

**El Juez Asociado señor RIVERA GARCÍA emitió la opinión del Tribunal.**

En San Juan, Puerto Rico, a 4 de junio de 2021.

En esta ocasión tenemos la oportunidad de reiterar y ampliar los contornos de la protección constitucional al derecho a la intimidad en el contexto laboral. Específicamente, nos corresponde determinar si el despido de un empleado fue justificado o no, por instalar dentro de la oficina de otra empleada una cámara de video escondida para observarla subrepticiamente. Por los fundamentos que esbozamos a continuación, reiteramos y reconocemos esta protección constitucional en el ámbito laboral y pautamos que la violación a este principio constitucional, mediante este tipo de conducta, es razón suficiente para el despido como primera falta grave en el empleo al amparo de la *Ley Sobre Despidos Injustificados* (Ley Núm. 80), Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185 (a) *et seq.*

# I

El 29 de junio de 2015 Indulac (Indulac o peticionaria) despidió al Sr. Víctor Vargas Taveras (señor Vargas Taveras o recurrido), quien se desempeñaba como Operador del área de empaque. Según la carta de despido, Indulac prescindió de sus servicios como empleado con base en una querella que presentó en su contra la Sra. Carmen Rivera Meléndez (señora Rivera Meléndez), Auditora de calidad, **"por invasión a la privacidad, acecho y hostigamiento"**. (Énfasis suplido).[1]

Inconforme con la decisión del patrono, la Central General de Trabajadores (Unión), presentó una Querella por despido injustificado a tenor con la Ley Núm. 80, *supra*, a través del procedimiento de quejas y agravios establecido en el Convenio Colectivo. El 14 de agosto de 2017, el Negociado de Conciliación y Arbitraje (Negociado), celebró una vista de arbitraje en la cual las partes tuvieron amplio espacio para someter sus respectivas alegaciones.

De la transcripción de la vista de arbitraje se desprende que la señora Rivera Meléndez comenzó a trabajar en Indulac desde marzo 2010, hasta diciembre 2015.[2] En síntesis, su trabajo consistía en auditar toda la documentación que se generaba durante la elaboración de leche, queso, mantequilla entre otros productos, con el

---

[1] *Carta de Terminación de Empleo,* Apéndice de la Petición de *certiorari*, pág. 103.
[2] *Vista de Arbitraje*, Apéndice de la Petición de *certiorari*, pág. 192.

propósito de cumplir con todos los parámetros establecidos por la agencia reguladora. Como parte de esta labor, la señora Rivera Meléndez se aseguraba que toda la información generada durante este procedimiento estuviese correcta y, de no ser así, corroboraba con los operadores de empaque para corregir esta información.

La señora Rivera Meléndez declaró que conocía al señor Vargas Taveras como uno de los operadores de empaque con los cuales trabajaba y que sostenía con él una relación cordial, igual a la que mantenía con los demás operadores.[3] Sin embargo, esbozó que debido al quehacer diario del trabajo llegó un momento en el que el recurrido frecuentaba con regularidad su oficina. Además de hablar de asuntos relacionados al trabajo, conversaban de otros temas y en algunas ocasiones el señor Vargas Taveras se quedaba dormido en un mueble de la oficina sin que a ella le molestara esa conducta.[4]

Sin embargo, el 14 de mayo de 2015, al regresar del receso del almuerzo, la señora Rivera Meléndez se percató de que el señor Vargas Taveras esperaba dentro de su oficina. Además, notó que un gabinete que estaba detrás de su escritorio estaba fuera de lugar y le preguntó al recurrido si él sabía por qué estaba de esa forma. El señor Vargas Taveras replicó que lo había tenido que mover porque

---

[3] Íd., pág. 193.
[4] Íd., pág. 194.

se le había caído un bolígrafo, pero que no lo devolvió a su posición original porque era muy pesado. Acto seguido, abandonó la oficina de la señora Rivera Meléndez.[5] Luego, la señora Rivera Meléndez trató de colocar el gabinete nuevamente en su posición. En ese momento se percató que había un cable que llegaba hasta una planta ornamental que estaba al lado del gabinete. Entonces, al sacar la extensión, se cayó una cámara de video que estaba oculta en la planta ornamental. Cuando el señor Vargas Taveras regresó a la oficina de la señora Rivera Meléndez, esta le preguntó sobre el cable. El recurrido le respondió que era para poner un radio, a lo que la señora Rivera Meléndez contestó sorprendida que ya tenía un radio en su oficina, por lo cual no necesitaba otro. A preguntas de la señora Rivera Meléndez por la cámara, el señor Vargas Taveras dijo que se trataba de una broma.[6] En ese momento, el recurrido se le acercó a la señora Rivera Meléndez e intentó tomar la cámara de sus manos. Sin embargo, esta última retuvo la cámara y le indicó que, de ser así, sería una broma de muy mal gusto.[7]

Así las cosas, la señora Rivera Meléndez le preguntó nuevamente la razón por la cual había colocado la cámara. En esta ocasión, el recurrido le contestó que la había instalado para saber si ella era la que estaba diciendo por la planta, que ella y José Miranda, otro empleado de

---

[5] Íd., pág. 197.
[6] Íd., pág. 198.
[7] Íd.

Indulac, eran "chillos".[8] A raíz de ello, la señora Rivera Meléndez le expresó al recurrido sentirse dolida y frustrada ya que es una mujer casada. Entonces, el señor Vargas Taveras se le acercó e intentó quitarle la cámara por segunda ocasión. La señora Rivera Meléndez nuevamente le preguntó la razón por la cual había colocado la cámara. En una tercera versión, el recurrido respondió que era porque en la planta estaban diciendo que él ——el señor Vargas Taveras—— y ella ——la señora Rivera Meléndez—— eran "chillos".[9] La señora Rivera Meléndez le comentó que eso no era cierto y le pidió que se retirara de su oficina porque estaba muy dolida. En ese momento, el señor Vargas Taveras se disculpó y le preguntó si lo perdonaba, a lo cual ella le respondió que sí, presuntamente para que este abandonara su oficina. Posteriormente, la señora Rivera Meléndez dialogó con el supervisor del recurrido sobre el incidente ocurrido.

La señora Rivera Meléndez narró que, al día siguiente, el 15 de mayo de 2015, al llegar a su trabajo escuchó a otros empleados comentar que el señor Vargas Taveras estaba bien perturbado y que había dicho que si cogía una pistola se iba a matar.[10] Ese mismo día, la Directora de Recursos Humanos se comunicó con la señora Rivera Meléndez para

---

[8] Íd.

[9] Íd., pág. 199.

[10] Íd., pág. 201.

investigar lo sucedido y le orientó sobre el procedimiento a seguir en este tipo de situaciones. Por ello, la señora Rivera Meléndez solicitó una orden de acecho en contra del recurrido ante el Tribunal de Primera Instancia, la cual posteriormente fue denegada por tratarse de un primer incidente.

Así las cosas, el 24 de junio de 2015, la señora Rivera Meléndez suscribió una declaración jurada sobre el incidente acontecido como parte de la investigación en curso por la Oficina de Recursos Humanos de Indulac.[11] En esa declaración jurada, la señora Rivera Meléndez reiteró los hechos ocurridos el 14 de mayo de 2015 y sostuvo que se sentía nerviosa, dolida, frustrada, asustada, y que temía por su seguridad y bienestar.[12] Además, **indicó que sintió que su intimidad fue violada al señor Vargas Taveras colocar una cámara de vídeo en su oficina.**[13]

Luego de celebrada la vista de arbitraje, el 6 de noviembre de 2017, el Negociado notificó su *Laudo de Arbitraje* mediante el cual declaró *ha lugar* la querella presentada por el señor Vargas Taveras y concluyó que su despido fue injustificado.[14] En apretada síntesis, el Negociado razonó que, la prueba presentada por Indulac no fue suficientemente convincente para demostrar que el

---

[11] Íd., pág. 202.
[12] *Declaración Jurada*, Apéndice de la Petición de *certiorari*, pág. 105.
[13] Íd., pág. 106.
[14] *Laudo de Arbitraje*, Apéndice de la Petición de *certiorari*, pág. 144.

recurrido incurrió en una conducta de hostigamiento sexual que infringiera la Ley Núm. 17 del 22 de abril de 1988, sobre la prohibición del hostigamiento sexual en el empleo. Como remedio, ordenó la reposición al empleo del señor Vargas Taveras, así como la paga retroactiva de todos los haberes dejados de percibir desde la fecha de su despido hasta su reposición en el empleo.

En desacuerdo, el 6 de diciembre de 2017, Indulac presentó ante el Tribunal de Primera Instancia una *Petición de revisión de laudo*. En esencia, la peticionaria alegó que el laudo era improcedente de conformidad con los argumentos siguientes: (1) el Negociado omitió las determinaciones de hechos y, por consiguiente, quebrantó las garantías mínimas del debido proceso de ley; (2) el Negociado descartó sin justificación alguna la prueba documental y testifical desfilada en la vista de arbitraje, pues la misma fue suficiente y no fue controvertida en forma alguna por la Unión; y (3) a la luz del estándar de preponderancia de la prueba y los precedentes judiciales establecidos por el Tribunal Supremo, el despido del señor Vargas Taveras fue justificado.

El 25 de enero de 2018, la Unión presentó una *Oposición a petición de revisión de laudo arbitral*. Solicitó que el tribunal de instancia confirmara el laudo emitido por el Negociado. La Unión indicó que no procedía revisar las determinaciones de hecho del laudo porque estaban

sustentadas por la evidencia en el expediente. Adujo que no era correcto el planteamiento de Indulac con relación a que no fueron resueltas todas las controversias sometidas. En efecto, arguyó que, al no ponerse de acuerdo las partes en sus respectivos proyectos de sumisión, el Árbitro determinó que el asunto a resolverse era si el despido del señor Vargas Taveras estuvo o no justificado y, de no estarlo, proveería el remedio adecuado. Así las cosas, la Unión arguyó que la controversia fue resuelta conforme a derecho.

El 4 de enero de 2019, el Tribunal de Primera Instancia dictó una sentencia en la cual dispuso que no existía razón en derecho para alterar el laudo emitido.[15] Concluyó que la determinación del Árbitro estaba sustentada por evidencia sustancial en el expediente y era conforme a derecho y a lo pactado entre las partes en el convenio colectivo. A su vez, determinó que, aunque el *Laudo de Arbitraje* indicaba que el estándar de prueba era el de más allá de duda razonable y prueba robusta y convincente, se colegía de las conclusiones de derecho que el Árbitro sí aplicó el estándar de prueba correcto. Además, concluyó que, aunque el L*audo de Arbitraje* no tenía enumeradas las determinaciones de hecho, el Árbitro resumió los hechos sustentados por la prueba para emitir sus conclusiones de derecho. El foro de

---

[15] *Sentencia SJ2017CV02706*, Apéndice de la Petición de *certiorari*, pág. 250.

instancia determinó que esos hechos basados en la prueba se podían reducir a nueve determinaciones de hechos.[16]

_____

[16] A continuación, se presentan las nueve (9) determinaciones de hechos mencionadas por el Tribunal de Primera Instancia:

1.  Las partes suscribieron un Convenio Colectivo con fecha de vigencia del 16 de diciembre de 2013 hasta el 16 de diciembre de 2016.

2.  La Sra. Carmen Rivera Meléndez, auditora de calidad a la fecha de los hechos, declaró que había trabajado en INDULAC del 2010 al 2015. Conocía al Sr. Vargas y su relación era "normal", al igual que con los otros empleados del Área de Producción.

3.  El 14 de mayo de 2015, luego de que la Sra. Rivera Meléndez regresó a su oficina y vio un gabinete fuera de sitio. Intentó arreglar el gabinete, pero no pudo. Observó una extensión y se percató de una cámara.

4.  Le preguntó al Sr. Vargas y éste le indicó que era para un radio, pero luego de que la Sra. Rivera Meléndez indagara sobre la cámara, éste le expresó que se trataba de una broma y que él la había puesto para ver si ella y Miranda eran chillos.

5.  La Sra. Rivera Meléndez declaró que se puso muy nerviosa e inmediatamente el Sr. Vargas le pidió perdón. Ella le dijo que no había problema, pero que se fuera de su oficina y procedió a informarlo a su supervisor.

6.  La Sra. Nancy Santiago se desempeñaba al momento de los hechos como Directora de Recursos Humanos de INDULAC donde trabajaba desde el 1984. Declaró que conoce al empleado Víctor Vargas y que el 15 de mayo de 2015, se reunió con la Sra. Rivera Meléndez, quien le informó que había encontrado una cámara en su oficina, que se sintió asustada; que se había reunido con el Sr. Vargas y éste le pidió perdón.

7.  La Sra. Santiago le recomendó a la Sra. Rivera que fuera a la Policía. La Sra. Rivera siguió su recomendación y acudió al Tribunal.

8.  La Sra. Rivera no presentó una Querella contra el Sr. Vargas. En su declaración jurada no habla de que fue hostigada sexualmente. En la misma, y en su testimonio ante el árbitro, tampoco expresó que el Sr. Vargas la agrediera, le gritara o le hiciera gestos inadecuados.

9.  Luego de una investigación, la Sra. Nancy Santiago envió una carta de despido al Sr. Vargas con fecha del 29 de junio de 2015.

*Sentencia SJ2017CV02706*, Apéndice de la Petición de *certiorari*, págs. 252-253.

Inconforme con esa determinación, el 31 de enero de 2019, Indulac presentó un recurso de *certiorari* ante el Tribunal de Apelaciones en el cual reiteró los errores señalados ante el tribunal de instancia. Luego, el 14 de junio de 2019, el foro apelativo intermedio notificó una resolución en la cual denegó expedir el recurso de *certiorari.*[17] Concluyó que no existía razón que justificara su intervención en sustitución de la determinación realizada por el Tribunal de Primera Instancia. Además, determinó que Indulac no demostró que el foro recurrido actuó con prejuicio, parcialidad, craso abuso de discreción o error manifiesto.

El 28 de junio de 2019, Indulac solicitó reconsideración del dictamen del Tribunal de Apelaciones. Sin embargo, este último denegó la reconsideración mediante resolución notificada el 29 de octubre de 2019.

Oportunamente, Indulac presentó un recurso de *certiorari* ante este Tribunal y expuso los señalamientos de error siguientes:

> Erró el Tribunal de Apelaciones, así como el Tribunal de Primera Instancia al determinar que el Laudo de Arbitraje se emitió conforme a derecho.

> Erró el Tribunal de Primera Instancia, así como el Negociado de Conciliación y Arbitraje, al determinar que el Patrono no presentó evidencia suficientemente convincente para justificar el despido del Sr. Vargas.

---

[17] *Resolución*, Apéndice de la Petición de *certiorari*, págs. 272.

Erró el Tribunal de Primera Instancia, así como el Negociado de Conciliación y Arbitraje, al determinar que el despido del Sr. Vargas fue injustificado y, consecuentemente, ordenar la reposición inmediata, así como el pago de todos los haberes dejados de percibir desde la fecha de su despido.

Erró el Tribunal de Primera Instancia al determinar que el laudo no es nulo, y que no se quebrantaron los requisitos mínimos del debido proceso de ley consagrados en la Constitución del Estado Libre Asociado de Puerto Rico.

Erró el Tribunal de Primera Instancia al determinar que el Árbitro pronunció o emitió nueve (9) determinaciones de hechos en el Laudo de Arbitraje.

Erró el Tribunal de Primera Instancia al determinar que el Negociado de Conciliación y Arbitraje utilizó el estándar de revisión adecuado.[18]

El 31 de enero de 2020 expedimos el auto solicitado. Cabe destacar que el 9 de diciembre de 2019 la Oficina de la Procuradora de las Mujeres (Procuradora) solicitó comparecer como *amicus curiae*. En esencia, argumentó que este caso es uno de alto interés público y que los foros recurridos actuaron en contravención con la política pública. En ese sentido, expresó que ubicar una cámara oculta en el área de trabajo de la perjudicada no es tan solo un acto de acecho y hostigamiento sexual sino una violación a la intimidad y dignidad humana. El 4 de marzo de 2020 emitimos una resolución mediante la cual declaramos ha lugar la referida solicitud.

---

[18] Petición de *certiorari*, pág. 11.

Tras examinar los alegatos de las partes, así como el escrito presentado por la Procuradora, procedemos a resolver.

## II

### A. La revisión judicial de los laudos de arbitraje

El arbitraje es el método alternativo de solución de disputas más formal que existe como alternativa al litigio tradicional.[19] En el arbitraje "las partes en disputa someten y presentan su caso ante un tercero neutral que está investido con la facultad de rendir una decisión".[20] Así, este proceso le impone un carácter excluyente al proceso judicial, ya que una cláusula de arbitraje es un contrato que impide a los jueces y tribunales conocer en primera instancia de los conflictos o cuestiones litigiosas sometidas a arbitraje.[21]

Por otro lado, el arbitraje en el ámbito laboral surge como parte del proceso de negociación colectiva.[22] En ese sentido, cuando en un convenio colectivo se pacta someter a arbitraje las controversias que puedan surgir entre el patrono y sus empleados, se crea un foro alterno a los tribunales que tiene el efecto de sustituir a los jueces por los árbitros.[23] Cabe destacar que en nuestro

---

[19] *Aut. Puertos v. HEO*, 186 DPR 417, 424 (2012).
[20] D. Fernández Quiñones, *El arbitraje obrero-patronal*, Colombia, Ed. Forum, 2000, pág. 9.
[21] Íd., pág. 10.
[22] *Aut. Puertos v. HEO*, supra, pág. 424.
[23] Íd.; *HIETel v. PRTC*, 182 DPR 451, 456 (2011); *Condado Plaza v. Asoc. Emp. Casinos P.R.*, 149 DPR 347, 352 (1999).

ordenamiento se favorece el arbitraje, especialmente en el entorno obrero-patronal pues, es menos técnico, más flexible y menos oneroso que los tribunales de justicia.[24]

Como indicamos, la sustitución de foros que presume la figura del arbitraje solo se puede exigir cuando lo hayan acordado las partes.[25] En el ámbito obrero-patronal "[d]ebe entenderse que el mismo surge como resultado de la voluntad de las partes de establecer en el convenio colectivo un mecanismo o procedimiento eficiente, que garantice la solución de disputas de forma justa".[26] Así, como parte de las negociaciones y prestaciones efectuadas por las partes, se logra un mecanismo que presenta una ventaja considerable para las partes en comparación con el litigio tradicional.[27] Ello, pues ese mecanismo no está revestido de la formalidad que aplica ante los tribunales de justicia.[28]

En cuanto a la revisión judicial de los laudos de arbitraje, hemos dispuesto que las determinaciones de los árbitros gozarán de gran deferencia.[29] Esta norma de autolimitación conlleva que los tribunales no lleguen a "considerar los méritos de un laudo, independientemente de que, de haber sido la controversia inicialmente resuelta a

---

[24] *Aut. Puertos v. HEO*, supra, págs. 424-425; *HIETel v. PRTC*, supra, pág. 456.
[25] *Aut. Puertos v. HEO*, supra, pág. 425.
[26] A. Acevedo Colom, *Legislación de relaciones del trabajo comentada*, San Juan, [s. ed.], 2007, pág. 227.
[27] Íd., pág. 228.
[28] Íd.
[29] *Aut. Puertos v. HEO*, supra, págs. 426-427; *Condado Plaza v. Asoc. Emp. Casinos P.R.*, supra, pág. 352; *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 DPR 318, 325 (1988).

nivel judicial, la determinación final hubiese sido otra".[30] A esos efectos, hemos establecido que la revisión judicial de los laudos emitidos en un procedimiento de arbitraje se "limitará a las instancias en las cuales quede demostrada la existencia de fraude, conducta impropia del árbitro, falta del debido proceso de ley, ausencia de jurisdicción, omisión de resolver todas las cuestiones en disputa o que el laudo sea contrario a la política pública".[31]

Ahora bien, esta norma de autolimitación encuentra una **<u>excepción</u>** cuando las partes pactan que los laudos de arbitraje se emitirán conforme a derecho.[32] Entonces, los árbitros están obligados a resolver las controversias según las doctrinas legales prevalecientes y aceptadas.[33] En aquellas instancias en las que los laudos se deban emitir conforme a derecho, la revisión judicial será más incisiva, por lo cual los tribunales podrán enmendar errores jurídicos relacionados al derecho aplicable.[34]

Entre los escenarios que permiten la revisión judicial incisiva se encuentra la falta de debido proceso de ley en el procedimiento de arbitraje. En cuanto al debido proceso de ley, hemos reconocido que se refiere al "derecho de toda persona a tener un proceso justo y con todas las debidas

---

[30] Acevedo Colom, op. cit., pág. 271.

[31] *C.O.P.R. v. S.P.U.*, 181 DPR 299, 328 (2011).

[32] *Aut. Puertos v. HEO*, supra, pág. 427.

[33] *Aut. Puertos v. HEO*, supra, pág. 427; *C.O.P.R. v. S.P.U.*, supra, pág. 329.

[34] *Aut. Puertos v. HEO*, supra, pág. 427; *Condado Plaza v. Asoc. Emp. Casinos P.R.*, supra, pág. 353.

garantías que ofrece la ley, tanto en el ámbito judicial como en el administrativo".[35] Este principio esencial de nuestro sistema democrático se recoge en el Art. II de la Sec. 7 de la Constitución de Puerto Rico y en la Quinta y Decimocuarta Enmienda de la Constitución de Estados Unidos. En su sustrato, este derecho garantiza que los ciudadanos no perderán su libertad o su propiedad sin la oportunidad básica de ser oídos.

Este derecho fundamental se manifiesta en dos dimensiones: la sustantiva y la procesal.[36] En su vertiente sustantiva, el debido proceso de ley representa una barrera para acciones estatales arbitrarias o caprichosas que afecten los derechos fundamentales de los ciudadanos.[37] Por su parte, en su vertiente propiamente procesal, el debido proceso de ley requiere que, de verse afectado algún derecho de propiedad o libertad de un ciudadano, este tendrá acceso a un proceso que se adherirá a los principios de justicia e imparcialidad.[38] Así pues, en un procedimiento de arbitraje en el que un ciudadano está expuesto a perder su empleo, es necesario que se cumpla con algún tipo de debido proceso de ley.[39] En un procedimiento de arbitraje "pueden estar implicados derechos de rango constitucional y de

---

[35] *Marrero Caratini v. Rodríguez Rodríguez*, 138 DPR 215, 220 (1995).
[36] *Domínguez Castro et al. v. E.L.A. I*, 178 DPR 1, 35 (2010).
[37] *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, 133 DPR 881, 887 (1993).
[38] Íd., págs. 887-888.
[39] *Aut. Puertos v. HEO*, supra, págs. 428-429; *HIETel v. PRTC*, supra, pág. 460.

carácter estatutario. Ello de suyo reclama la presencia ineludible de unos requisitos procesales que garanticen el respeto y cumplimiento de esos derechos".[40]

Ahora bien, ¿cuál es el debido proceso que se debe sostener en el arbitraje obrero-patronal? A esos fines, el profesor Fernández Quiñones dispone lo siguiente:

> Si se toman en consideración las características básicas del procedimiento de arbitraje — flexibilidad, rapidez e informalidad—, puede inferirse que el debido procedimiento de ley que se exige es uno que no puede estar matizado de la rigidez que particulariza una vista judicial. Por consiguiente, la vista no se gobierna estrictamente por las reglas de evidencia. [...] En la medida en que se proporcione a las partes la oportunidad de prepararse para hacer frente a lo que es objeto de controversia, de estar presente en las vistas que se celebran, de escuchar los testimonios en su contra y de contrainterrogar a los testigos contrarios y de que el laudo se funde en la evidencia que ha desfilado ante el árbitro se ha respetado el debido procedimiento de ley.[41]

Por ello, se ha establecido que el debido proceso de ley que se exige en un procedimiento de arbitraje es el mínimo necesario que acredite una resolución justa de la controversia.[42] Es decir, las normas del debido proceso de ley que deben regir los procesos de arbitraje son paralelas a las existentes en el ámbito del Derecho Administrativo.[43]

Cónsono con lo anterior, en todo proceso de arbitraje se debe cumplir con los elementos básicos de la justicia,

---

[40] Fernández Quiñones, op. cit., pág. 544.
[41] Fernández Quiñones, op. cit., págs. 545-546.
[42] *Aut. Puertos v. HEO*, supra, pág. 429.
[43] Íd. Véase Fernández Quiñones, op. cit., pág. 546.

lo cual incluye un trato justo e imparcial.[44] En ese sentido, hemos establecido que se cumple con el debido proceso de ley en el ámbito del arbitraje obrero-patronal si se le notifica e informa al agraviado de los cargos en su contra, se celebra una vista y se le da oportunidad al agraviado de someter evidencia.[45]

**B. Despido injustificado**

La Ley Núm. 80, *supra*, protege a aquellos empleados remunerados, contratados por tiempo indeterminado y despedidos injustificadamente de su trabajo.[46] Conforme a este estatuto, el patrono tiene que pagarle al empleado cesanteado una indemnización conocida como "mesada", además del sueldo devengado hasta la fecha del despido.[47] El pago de la mesada sirve un doble propósito, pues desalienta la práctica de despedir empleados sin que exista justa causa para ello. Además, le proporciona una ayuda económica al empleado que no cuenta con los ingresos de su antiguo puesto.[48]

De otra parte, según provisto en la Ley Núm. 80, *supra*, la mesada representa el remedio exclusivo disponible a un empleado cesanteado injustificadamente frente a su

---

[44] *Aut. Puertos v. HEO*, supra, págs. 429-430.

[45] Íd.; *S.I.U. de P.R. v. Otis Elevator Co.*, 105 DPR 832, 837 (1977). Véase, también, Fernández Quiñones, op. cit., pág. 544.

[46] *León Torres v. Rivera Lebrón*, 2020 TSPR 21, 204 DPR __ (2020).

[47] Íd.; *González Méndez v. Acción Social et al.*, 196 DPR 213, 230 (2016); *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 232 (2015); *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015).

[48] *León Torres v. Rivera Lebrón*, supra; *González Méndez v. Acción Social et al.*, supra; *SLG Torres-Matundan v. Centro Patología*, supra; *Reyes Sánchez v. Eaton Electrical*, 189 DPR 586, 597-598 (2013).

expatrono. Esto es así a no ser que existan otras causas de acción independientes al despido.[49]

Ahora bien, la Ley Núm. 80, *supra*, no establece específicamente qué constituye un despido injustificado. Sin embargo, menciona varios escenarios que liberan al patrono de responsabilidad. Algunos de estos supuestos están basados en conducta atribuible al empleado, mientras que otros responden al cierre, reorganización o reducción de la empresa.[50]

En cuanto a la conducta del empleado, se ha dispuesto que se considerarán como justa causa para el despido las acciones siguientes: (1) ha exhibido un patrón de conducta impropia o desordenada;(2) no ha cumplido con sus labores de manera eficiente, ha realizado su trabajo tarde o negligentemente o en violación a las normas aplicables, o (3) ha violado reiteradamente aquellas reglas y reglamentos razonablemente establecidos para la operación del establecimiento y los cuales le han sido suministrados oportunamente.[51] Sin embargo, la Ley Núm. 80, *supra*, dispone que "[n]o se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón

---

[49] *León Torres v. Rivera Lebrón*, supra; *González Méndez v. Acción Social et al.*, supra; *Lugo Montalvo v. Sol Meliá Vacation*, supra; *SLG Torres-Matundan v. Centro Patología*, supra.

[50] Véase Art. 2 de la Ley Núm. 80, 29 LPRA sec. 185b (2017). Véanse, también: *Roldán Flores v. M. Cuebas*, 199 DPR 664, 682 (2018); *González Méndez v. Acción Social et al.*, supra; *SLG Torres-Matundan v. Centro Patología*, supra; *Reyes Sánchez v. Eaton Electrical*, supra; *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 427 (2013).

[51] Art. 2 de la Ley Núm. 80, *supra*. Véase, además, *González Méndez v. Acción Social et al.*, supra.

relacionada con el buen y normal funcionamiento del establecimiento".[52]

Cabe destacar que hemos aclarado que las circunstancias constitutivas de justa causa, según enumeradas en el Art. 2 de la Ley Núm. 80, *supra*, constituyen meros ejemplos de circunstancias asociadas a un despido.[53] Por lo tanto, el estatuto no prevé el universo de incidencias que puedan surgir en un entorno laboral y que desemboquen en la cesantía de un empleado.[54]

En ese sentido, el Art. 2 de la Ley Núm. 80, *supra*, no dispone una lista taxativa de las circunstancias que pueden dar lugar a un despido por justa causa. Esta realidad obedece a que la Ley Núm. 80, *supra*, "no favorece el despido como sanción a la primera falta cometida por un empleado".[55] Sin embargo, aunque la Ley no favorece el despido como sanción a la primera falta, esta no es una norma absoluta. Este Tribunal ha resuelto que existen circunstancias en las que **una sola ofensa** o **primera falta** pudieran justificar un despido. Así pues, este curso de acción podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo la seguridad, el orden

---

[52] Art. 2 de la Ley Núm. 80, supra. Véase, además, *González Méndez v. Acción Social et al.*, supra.

[53] *León Torres v. Rivera Lebrón*, supra.

[54] Íd.; *SLG Torres-Matundan v. Centro Patología*, supra.

[55] *Secretario del Trabajo v. I.T.T.*, 108 DPR 536, 543 (1979).

y la eficiencia que constituye el funcionamiento de la

empresa.[56] En específico, hemos expresado lo siguiente:

> Toda vez que la falta única se sanciona con despido sólo por excepción […] **La falta o acto aislado que dé lugar a despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento".** (Énfasis suplido).[57]

Es decir, al amparo de la Ley Núm. 80, *supra*, se ha

reconocido que una sola ofensa puede constituir justa causa

para el despido. Ahora bien, dicha falta debe ser de tal

seriedad o naturaleza que revele una actitud o un detalle

del carácter del empleado, tan lesivo a la paz y al buen

orden de la empresa, que constituiría imprudencia esperar

su reiteración para separarlo del establecimiento.[58] De

modo, que lo esencial es que del agravio perpetrado por el

empleado ponga de manifiesto una condición, que dentro del

contexto del empleo sea inaceptable o intolerable,

independientemente de que se trate de una primera falta.[59]

A manera de ejemplo, en *Delgado Zayas v. Hosp. Int.*

*Med. Avanzada,* 137 DPR 643 (1994)*,* el Patrono despidió a un

empleado por un solo acto de hostigamiento sexual. Allí, un

empleado le impidió la salida del baño a una empleada

---

[56] Véase *Rivera v. Pan Pepín Inc.,* 161 DPR 681, 690 (2004); *Delgado Zayas v. Hosp. Int. Med. Avanzada*, 137 DPR 643, 649-650(1994).

[57] *Secretario del Trabajo v. I.T.T.*, supra, págs. 543-544.

[58] *Rivera Torres v. Pan Pepín Inc.*, supra; *Jusino Figueroa v. Walgreens*, supra; *Delgado Zayas v. Hosp. Int. Med. Avanzada*, supra; *Aut. De Edificios Públicos v. Unión Independiente*, 130 DPR 983, 994 (1992); *Secretario del Trabajo v. I.T.T.*, supra.

[59] Véase *Torres Solano v. P.R.T.C.*, 127 DPR 499, 516 (1990)*; Autoridad de Edificios Públicos v. Unión Independiente*, supra.

mientras le requería que aceptara su invitación de salir con él fuera del trabajo. La empleada expresó sentirse humillada ya que su libertad fue restringida. En nuestro análisis, este Tribunal expresó que la actuación del empleado era de tal naturaleza que el patrono debía tomar acción inmediata para conservar la paz y el funcionamiento normal del lugar de empleo. En ese sentido, determinamos que, se configuró el hostigamiento sexual en su modalidad de ambiente hostil. Confirmamos que, hubiese sido una imprudencia del hospital no tomar acción contra el empleado y, además, estaría incumpliendo con la responsabilidad que la Ley de Hostigamiento Sexual les impone a los patronos. Finalmente, concluimos que el despido fue justificado.

## C. Derecho a la Intimidad

El derecho a la intimidad y a la dignidad del ser humano, ocupan el sitial de mayor jerarquía entre los valores más transcendentales reconocidos por nuestra Constitución. La protección constitucional a estos derechos está plasmada, en el Art. II, Secs. 1 y 8 de nuestra Carta Magna.[60]

_____

[60] En lo pertinente, estas disposiciones de la Constitución de Puerto Rico establecen lo siguiente:

Sec. 1--La dignidad del ser humano es inviolable.
.   .   .   .   .   .   .   .

Sec. 8--Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar.

Art. II, Sec. 1 y 8, Const. ELA, LPRA, Tomo 1, ed. 2016, págs. 275 y 354.

Conforme hemos expresado, la dignidad del ser humano "se fundamenta en el entendido universal de que todas las personas tienen un valor intrínseco, el cual 'existe en idéntica magnitud en cada uno de ellos'".[61] Este derecho fundamental constituye el principio más básico que inspiró a los otros derechos reconocidos en nuestra Constitución.[62]

Por otra parte, el derecho a la intimidad es uno de los llamados derechos de la personalidad de índole innata y privada.[63] A diferencia de la Constitución federal, nuestra Constitución lo reconoce expresamente.[64] En nuestro ordenamiento jurídico hemos reconocido que el derecho a la vida privada y familiar puede hacerse valer tanto frente al Estado (acción estatal), como frente a personas privadas. Ello, pues "[e]ste derecho constitucional impone a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos".[65]

Así lo razonó nuestra Asamblea Constituyente cuando formuló una Carta de Derechos de factura más ancha que la tradicional.[66] Bajo ese crisol amplio y diverso de derechos, la Comisión sobre la Carta de Derechos en su informe para

---

[61] *Garib Bazain v. Hosp. Español Auxilio Mutuo de Puerto Rico*, 2020 TSPR 69, 204 DPR __ (2020) citando a C. E. Ramos González, *La inviolabilidad de la dignidad humana: Lo indigno de la búsqueda de expectativas razonables de intimidad en el Derecho Constitucional Puertorriqueño*, 45 Rev. Jur. UIPR 185, 186 (2010).

[62] Véase *Vega et al. v. Telefónica*, 156 DPR 584, 602 (2002).

[63] J. Castán Tobeñas, Derecho civil español, común y foral, 11ma ed., Madrid, Ed. Reus, 1971, T. I, Vol. II, pág. 325.

[64] *El Vocero de P.R. v. E.L.A.*, 131 DPR 356, 428 (1992); *Arroyo v. Rattan Specialties, Inc.*, 117 DPR 35, 75 (1986); *Figueroa Ferrer v. E.L.A.*, 107 DPR 250, 258 (1978).

[65] Colón v. Romero Barceló, 112 DPR 573, 576 (1982).

[66] P.R. Tel. Co. v. Martínez, supra, págs. 338-40.

la Convención Constituyente enfatizó con relación a la Sec. 8 del Art. II de la Constitución de Puerto Rico que:

> La protección contra ataques a la honra, reputación, y **vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta constitución**. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente atentados provenientes de otros particulares, sino también contra injerencias abusivas de las autoridades[...]. (Énfasis suplido).[67]

En reconocimiento a lo expuesto, este Tribunal ha establecido patentemente que el derecho a la intimidad es un derecho fundamental, "que goza de la más alta protección bajo nuestra Constitución y constituye un ámbito exento capaz de impedir o limitar la intervención de terceros—sean particulares o poderes públicos— contra la voluntad del titular".[68]     Además     hemos     indicado     que el derecho a la intimidad opera *ex proprio vigore*, por lo que no se requiere legislación para exigir su cumplimiento.[69] Ahora bien, a pesar de considerarse un derecho de alta jerarquía, este no es de carácter absoluto, ni "vence a todo valor en conflicto bajo todo supuesto posible".[70] Por lo tanto, esta protección contra ataques abusivos a la honra y a la intimidad de las personas tiene

---

[67] 4 Diario de sesiones de la Convención Constituyente, pág. 2566.

[68] López Tristant v. Maldonado, 168 DPR 838, 849 (2006); Castro v. Tiendas Pitusa, 159 DPR 650, 659 (2003). Véase, además, R. De Ángel Yagüez, *La protección de la personalidad en el derecho privado*, 83 Rev. Der. Not. 1, 42 (enero-marzo 1974).

[69] Roig Pou v. Registro Demográfico de Puerto Rico, 203 DPR 346, 352 (2019), citando a *P.R. Tel. Co. v. Martínez*, supra.

[70] *Vega et al. v. Telefónica*, supra, pág. 602 citando a *E.L.A. v. P.R. Tel. Co.*, 114 DPR 398, 401 (1983).

que examinarse caso a caso, tomando en consideración las variables de tiempo y lugar en la controversia ante nuestra consideración.[71]

Ante una reclamación de violación a este derecho constitucional, "la cuestión central es si la persona tiene derecho a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete".[72] Además, para que se cumpla con el criterio de la expectativa razonable de intimidad deben concurrir los dos elementos siguientes: "(1) que el reclamante, dentro de las circunstancias de su caso, tenga una expectativa real de que su intimidad se respete (criterio subjetivo), y (2) que la sociedad esté dispuesta a reconocer esa expectativa como legítima o razonable (criterio objetivo)".[73]

Cabe señalar que, si bien estos criterios han sido evaluados y aplicados generalmente en casos de naturaleza criminal, eso no es óbice para su evaluación y aplicación en el ámbito laboral.[74] De hecho, así reconocimos la protección del derecho a la intimidad de los empleados en su lugar de trabajo.[75] En Puerto Rico un patrono privado viene obligado a respetar el derecho a la intimidad de sus

---

[71] Íd.

[72] Íd.

[73] Íd.

[74] Íd., pág. 603; *Pueblo v. Santiago Feliciano*, supra; *P.R. Tel. Co. v. Martínez*, supra; *Pueblo v. Yip Berríos*, 142 DPR 386, 398-399 (1997).

[75] *Vega et al. v. Telefónica*, supra; *Soc. de Gananciales v. Royal Bank de P.R.*, 145 DPR 178, 202 (1998); *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 75.

empleados de la misma forma en la cual el patrono público le corresponde hacerlo.[76] Asimismo, al interpretar la dignidad, intimidad e integridad personal de un empleado dentro del contexto laboral, indicamos que la protección al derecho a la intimidad

> es necesaria para que se pueda lograr una adecuada paz social o colectiva. Una persona respetada en su intimidad y dignidad —que no es otra cosa que el amplio y, en ocasiones, complejo mundo interior individual— sentirá y vivirá la paz, el respeto y la consideración merecida por todo ser humano en una sociedad. Es de esperarse, pues, que esos mismos sentimientos, vitales para una ordenada, racional y pacífica convivencia social, sean proyectados de manera efectiva a nuestro orden social.[77]

En vista de lo anterior, nos hemos expresado en dos ocasiones sobre la protección constitucional del derecho de la intimidad en el contexto laboral. Sin embargo, en ambas ocasiones las controversias planteadas surgían de una presunta violación al derecho a la intimidad por parte del patrono al empleado. Este tribunal nunca ha atendido una controversia en cual la presunta violación al derecho a la intimidad haya ocurrido por parte de un empleado a otro.

En el primer caso, *Arroyo v. Rattan Specialties, Inc.*, 117 DPR 35, 43 (1986), resolvimos que la Regla 41 del Reglamento de una empresa era inconstitucional debido a que violentaba el derecho constitucional a la intimidad que albergaban los empleados en su lugar de trabajo. Allí, la

---

[76] *Vega et al. v. Telefónica*, supra, pág. 602.
[77] *Arroyo v. Rattan Specialties, Inc*, supra, pág. 62.

empresa despidió a un empleado por negarse a tomar un examen de polígrafo, el cual presuntamente tenía como propósito proteger y garantizar el uso y disfrute de la propiedad privada de la empresa.

A la luz de los hechos aquí planteados, razonamos que "independientemente del grado de confiabilidad que llegue a alcanzar la prueba del polígrafo, su intrusión con la mente del ser humano, [y] con su intimidad, es tal, que éste pierde la libertad de controlar la divulgación de sus propios pensamientos".[78] Asimismo, añadimos que "[n]uestra Constitución garantiza que podamos acotar una parte de nosotros mismos libre de la intromisión tanto del Estado como de los ciudadanos privados".[79] De esa forma, resolvimos que:

> En ausencia de circunstancias especiales que configuren intereses apremiantes del Estado, **nuestra sociedad requiere que inclinemos la balanza en favor de la protección de los derechos del obrero a la intimidad, dignidad y a estar protegido contra riesgos para su integridad personal en el trabajo**, frente al derecho del patrono al disfrute de su propiedad privada. (Énfasis suplido).[80]

Por otro lado, en *Vega et al. v. Telefónica*, 156 DPR 584 (2002), analizamos si la práctica de un patrono privado de **observar y grabar** de forma ininterrumpida en cinta de video a sus empleados en un área de trabajo abierta, pero

---

[78] *Arroyo v. Rattan Specialties, Inc*, supra, pág. 61.
[79] Íd., pág. 62.
[80] Íd., pág. 63.

no accesible al público, viola el derecho a la intimidad.
En esta ocasión, el patrono ──una empresa privada──
estableció un sistema de vigilancia electrónica, creada con
el propósito de proteger equipo de vital importancia para
el área de las telecomunicaciones en Puerto Rico.[81] En este
caso, reconocimos que el patrono tiene el derecho a proteger
de forma razonable su propiedad privada y que "[l]a
**vigilancia electrónica razonable** en el lugar de trabajo es
una forma legítima para el patrono proteger su propiedad".
(Énfasis suplido).[82] Determinamos que "[e]l uso de las
tecnologías modernas como el vídeo y el circuito cerrado
ayudan a prevenir actos de sabotaje, robos y el mal uso de
los recursos disponibles en el lugar de empleo, entre otras
cosas".[83] Por consiguiente, resolvimos que "el sistema de
vigilancia establecido por la empresa no es
inconstitucional *per se*"[84] debido a que este sistema "se
justifica[ba] por los intereses apremiantes de seguridad y
el óptimo funcionamiento del sistema de comunicaciones en
Puerto Rico que la [empresa] pers[eguía]".[85] Concluimos que
"éstos son fines por demás legítimos que nos inclina[ban]
a [determinar] que el mero hecho de hacer uso de éstos no
constituye una intromisión impermisible en la intimidad del
empleado".[86]

---

[81] *Vega et al. v. Telefónica*, supra, pág. 604.
[82] Íd., pág. 608.
[83] Íd.
[84] Íd.
[85] Íd., pág. 613.
[86] Íd., pág. 608.

## D. Hostigamiento sexual

Nuestra Asamblea Legislativa ha adoptado una serie de estatutos que buscan proteger a los ciudadanos de discrímenes en el ámbito laboral.[87] Entre las disposiciones que ha aprobado se encuentra la Ley Núm. 17 de 22 de abril de 1988 (29 LPRA sec. 155 et seq.), mediante la cual declaró como política pública del Estado que el hostigamiento sexual es una forma de discrimen por razón de sexo que atenta contra la inviolabilidad de la dignidad del ser humano.[88] La exposición de motivos de la referida ley indica que "[l]a magnitud de este problema es algo que nos debe interesar y preocupar a todos, ya que el hostigamiento sexual en el empleo constituye una ofensa repudiable contra la dignidad de todo ser humano".[89] Así, se igualó el hostigamiento sexual a otras modalidades de discrimen proscritas en leyes anteriores.[90] De este modo, se prohibió terminantemente el hostigamiento sexual en el empleo, impuso responsabilidades y fijó las penas correspondientes por incumplimiento.[91]

---

[87] *Rosa Maisonet v. ASEM*, 192 DPR 368, 379 (2015). Véanse, por ejemplo, la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA secs. 146-151, que prohíbe que se despida, suspenda o discrimine contra un empleado, *inter alia*, por razón de sexo, y la Ley Núm. 69 de 6 de julio de 1985, según enmendada, 29 LPRA sec. 1321 *et seq.*, la cual prohíbe el discrimen por razón de sexo en el empleo.

[88] *Rosa Maisonet v. ASEM*, supra, pág. 379; *U.P.R. Aguadilla v. Lorenzo Hernández*, supra, pág. 1015. Véanse, además: *Delgado Zayas v. Hosp. Int. Med. Avanzada*, supra, pág. 651; *Rodríguez Meléndez v. Sup. Amigo, Inc.*, 126 DPR 117, 125 esc. 4 (1990).

[89] Exposición de Motivos de la Ley Núm. 17, *supra*, 1988 Leyes de Puerto Rico 80. Véase, además, Art. 1 de la Ley Núm. 17 de 22 de abril de 1988, según enmendada, 29 LPRA sec. 155.

[90] *Rosa Maisonet v. ASEM*, supra, págs. 379-380. Véase también, Exposición de Motivos de la Ley Núm. 17, *supra*, 1988 Leyes de Puerto Rico 80.

[91] 29 LPRA sec. 155 et seq.

El Art. 3 de la Ley Núm. 17, *supra*, define el hostigamiento sexual de la manera siguiente:

> El hostigamiento sexual en el empleo consiste en cualquier tipo de acercamiento sexual no deseado, requerimientos de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual cuando se da una o más de las siguientes circunstancias:
>
> (a) Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.
>
> (b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.
>
> (c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo.[92]

En cuanto a los incisos (a) y (b) de la Ley Núm. 17, *supra*, hemos reconocido que estos se refieren a la modalidad de hostigamiento conocida como "hostigamiento equivalente", o *quid pro quo*. El inciso (c) recoge la modalidad de hostigamiento sexual por ambiente hostil.[93]

El hostigamiento equivalente se materializa cuando "el sometimiento o el rechazo de los avances o requerimientos sexuales se toma como fundamento para afectar beneficios tangibles en el empleo".[94] De otra parte, la modalidad de hostigamiento sexual por ambiente hostil sucede "cuando la conducta sexual para con un individuo tiene el efecto de

---

[92] 29 LPRA sec. 155b.
[93] *Rosa Maisonet v. ASEM*, supra, págs. 379-380; *Delgado Zayas v. Hosp. Int. Med. Avanzada*, supra, pág. 653.
[94] *Rodríguez Meléndez v. Sup. Amigo, Inc.*, supra, pág. 132.

interferir irrazonablemente con el desempeño de su trabajo o de crear en el mismo un ambiente intimidante, hostil u ofensivo".[95] Cabe resaltar que la Ley Núm. 17, *supra*, establece que para determinar si una conducta constituye hostigamiento sexual, en cualquiera de sus modalidades, será necesario considerar la totalidad de las circunstancias y los hechos particulares de cada caso.[96]

Una vez se determina que una conducta constituye hostigamiento sexual, la Ley Núm. 17, *supra*, responsabiliza al patrono mediante sanción por las consecuencias de la conducta ilegal.[97] Ahora bien, la responsabilidad patronal dependerá de la relación laboral existente entre el hostigador y la víctima, pues el estatuto distingue entre los actos de hostigamiento cometidos por el patrono, sus supervisores o agentes y aquellos actos realizados por los empleados.[98]

Consonó con lo anterior, la Ley Núm. 17, *supra*, le impone a todo patrono el deber afirmativo de tomar aquellas medidas necesarias para prevenir, prohibir y erradicar el hostigamiento sexual en el empleo.[99] A esos fines, le impone la obligación de que exponga de manera clara su política

---

[95] Íd., págs. 131-132. Véase, además, *Albino v. Ángel Martínez, Inc.*, 171 DPR 457, 471 (2007).

[96] 29 LPRA sec. 155c; *Rosa Maisonet v. ASEM*, supra, pág. 381; *Albino v. Ángel Martínez, Inc.*, supra, pág. 471.

[97] *Rosa Maisonet v. ASEM*, supra, pág. 381; *Albino v. Ángel Martínez, Inc.*, supra, pág. 472.

[98] 29 LPRA secs. 155d y 155e. Véase, además, 29 LPRA secs. 155f, 155g y 155h.

[99] *Rosa Maisonet v. ASEM*, supra, pág. 381; *Delgado Zayas v. Hosp. Int. Med. Avanzada*, supra, pág. 652.

institucional contra el hostigamiento sexual en aras de garantizar que su fuerza laboral goce de un ambiente de trabajo seguro en el cual se proteja su dignidad.[100]

Así pues, "[c]orresponde a cada patrono, a la luz de las circunstancias particulares, tomar las medidas cautelares que sean necesarias para evitar con efectividad el hostigamiento sexual en sus talleres de trabajo".[101] Entre las medidas que los patronos pueden tomar se encuentran las siguientes:

> (a) Expresar claramente a sus supervisores y empleados que el patrono tiene una política enérgica contra el hostigamiento sexual en el empleo.
>
> (b) Poner en práctica los métodos necesarios para crear conciencia y dar a conocer la prohibición del hostigamiento sexual en el empleo.
>
> (c) Dar suficiente publicidad en el lugar de trabajo, para los aspirantes a empleo, de los derechos y protección que se les confieren y otorgan.
>
> (d) Establecer un procedimiento interno adecuado y efectivo para atender querellas de hostigamiento sexual.[102]

En ese sentido, la Ley Núm. 17, *supra*, provee unas guías mínimas y le confiere discreción a cada patrono para adoptar aquellas normas que entienda convenientes para cumplir con el deber afirmativo que le impone ese estatuto.[103] No obstante, en caso de ocurrir un incidente de esta naturaleza, la Ley Núm. 17, *supra*, le exige al patrono

---

[100] Íd.; 29 LPRA sec. 155i.
[101] *Delgado Zayas v. Hosp. Int. Med. Avanzada*, supra, pág. 658.
[102] 29 LPRA sec. 155i.
[103] *Rosa Maisonet v. ASEM*, supra, pág. 383.

tomar una "acción inmediata y apropiada para corregir la situación".[104]

### III

En primer lugar, es imperativo señalar que, de acuerdo con el Convenio Colectivo suscrito por Indulac y la Unión, se acordó que cualquier controversia o disputa que surgiera sobre el despido de un empleado, podría ser resuelta por el Negociado y que "las decisiones del árbitro ser[ían] finales y **conforme a derecho**". (Énfasis suplido).[105] Como expresamos, es doctrina reiterada por este Tribunal que un laudo de arbitraje podrá ser revisado en todas sus partes si el convenio colectivo o el acuerdo de sumisión suscrito por las partes disponen que el laudo deba ser emitido conforme a derecho.[106] Por lo tanto, en el presente caso, con las partes acordar que las decisiones del árbitro serían conforme a derecho, la revisión judicial de este Tribunal será incisiva en aras de enmendar aquellos errores jurídicos cometidos en el proceso de arbitraje obrero-patronal.

Por estar íntimamente relacionados, consideraremos conjuntamente los señalamientos de error relacionados a que los foros recurridos erraron al determinar la validez del laudo emitido, al entender que no se quebrantaron los

---

[104] 29 LPRA sec. 155e.

[105] *Convenio Colectivo*, Apéndice de la Petición de *certiorari*, pág. 81.

[106] Véase J.R.T. v. Hato Rey Psychiatric Hosp., supra, a la pág. 68; U.I.L. de Ponce v. Dest. Serrallés, Inc., 116 DPR 348, 353 (1985); C.R.U.V. v. Hampton Dey., 112 DPR 59, 64 (1982); J.R.T. v. Securitas, Inc., 111 DPR 580, 582 (1981); S.I.U. de P.R. v. Otis Elevator Co., 105 DPR 832, 837 (1977).

requisitos mínimos del debido proceso de ley y, que erraron al determinar que el Árbitro emitió nueve determinaciones de hechos en el *Laudo de Arbitraje*. Consideramos que no se cometieron estos errores.

Indulac alega en su *Petición de Certiorari* que, de una somera lectura del *Laudo de Arbitraje* se puede concluir que el Árbitro no hizo determinaciones de hechos, sino que meramente se limitó a un resumen incompleto de la prueba presentada para luego pasar a aplicar el derecho equivocado.[107] Sostiene que, dicha omisión crasa, no solo quebranta las exigencias mínimas del debido proceso de ley, sino que dejó sin resolver los hechos medulares y necesarios en el presente caso, para entonces proceder a determinar si el despido del aquí recurrente estuvo o no justificado. Arguye que la ausencia total de conclusiones de hechos en el laudo lo convierte nulo en derecho.

Por su parte, la Unión alega que al examinar el expediente del caso se desprende que hubo una adecuada notificación, la cual no está en disputa; la celebración de vista; oportunidad de someter evidencia y una determinación completamente amparada en la evidencia testifical y documental desfilada.[108] Arguye que hubo amplia oportunidad de las partes para interrogar, contrainterrogar testigos y confrontarse con la prueba documental. Por último, sostiene

---

[107] Petición de *certiorari*, pág. 23.
[108] Alegato de la parte recurrida, pág. 12.

que el patrono no pudo establecer que las determinaciones del Árbitro estuvieron fundamentadas en evidencia que no sea la que obra en el expediente del caso.

En síntesis, coincidimos con el foro primario al determinar que no hubo violación al debido proceso de ley y que el *Laudo de Arbitraje* incluyó determinaciones de hechos. En primer lugar, durante el proceso de arbitraje obrero-patronal llevado a cabo en el caso de marras, se cumplieron cabalmente con las garantías mínimas del debido proceso de ley. Es decir, se cumplió con un proceso justo e imparcial, se les notificó a las partes sobre la celebración de una vista y se le dio oportunidad al agraviado de someter evidencia. Cabe resaltar, que el recurrido no presentó evidencia y solo se limitó a contrainterrogar a las testigos de la parte peticionaria.

En segundo lugar, es harto conocido que el arbitraje obrero-patronal es menos técnico, más flexible, menos oneroso y no está revestido de la formalidad que aplica ante los tribunales. En el *Laudo de Arbitraje*, el Árbitro resumió en forma narrada los hechos que aquilató conforme a la prueba presentada.[109] Ese error no se cometió.

Sin embargo, coincidimos con la parte peticionaria en que el Arbitró **erró en la aplicación del derecho a los hechos**. Veamos.

---

[109] *Laudo de Arbitraje*, Apéndice de la Petición de *certiorari,* págs. 148-149.

Tanto el Árbitro como el foro de primera instancia concluyeron que el patrono **no presentó evidencia suficiente** para concluir que el despido fue justificado. La determinación se centró en si la conducta del recurrido configuraba un **patrón** de hostigamiento sexual en la modalidad de ambiente hostil en la empresa contra la señora Rivera Meléndez. Sobre este particular, coincidimos con el Negociado y el Tribunal de Primera Instancia. **De una evaluación minuciosa del expediente del caso no surge evidencia suficiente para determinar que el recurrido exhibió una conducta de hostigamiento sexual en la modalidad de ambiente hostil**. Incluso, de un análisis profundo de la Declaración Jurada otorgada por la señora Rivera Meléndez, esta nunca expresó sentirse hostigada sexualmente por el recurrido, más bien indicó que se sintió dolida ante la explicación del recurrido de haber colocado la cámara para saber si ella era la que estaba diciendo por la planta, que ella y José Miranda —otro empleado de Indulac—, eran "chillos". En ese sentido, aunque ciertamente incisivas y desagradables, no podemos concluir que las expresiones del señor Vargas Taveras constituyen hostigamiento sexual. Las dos explicaciones otorgadas por el recurrido a la señora Rivera Meléndez sobre la instalación de la cámara en su oficina, aunque incómodas e indeseadas, no configuraron un hostigamiento sexual en su modalidad de ambiente hostil.[110]

---

[110] A pesar de que la Política de Hostigamiento Sexual de Indulac establece que cualquier empleado que viole esta política mediante

Es decir, el mero uso de la palabra "chillos" en la respuesta del recurrido a la pregunta realizada por la señora Rivera Meléndez de por qué había instalado la cámara, es insuficiente para concluir que se configuró un acercamiento sexual o una propia conducta de naturaleza sexual. Asimismo, el hecho de que el recurrido haya instalado la cámara en la oficina de la señora Rivera Meléndez, por sí solo, no puede interpretarse como una conducta sexual, pues el recurrido pudo haber tenido un propósito que no fuera de índole sexual. Ello máxime cuando se toma en consideración que el recurrido le expresó a la señora Rivera Meléndez que colocó la cámara para verificar cierta información. **Resolver lo contrario sería incurrir en especulación**. Así pues, no descartamos que la instalación de una cámara de video pudiera constituir hostigamiento sexual en determinada situación. Sin embargo, en este caso los hechos no apoyan esa conclusión.

Ahora bien, lo anterior **no debió tener el efecto de que se concluyera que el despido fue injustificado**. Los foros inferiores debieron evaluar si el despido fue hecho por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Según expresamos anteriormente, aunque la Ley Núm. 80, *supra*, no favorece el despido como sanción a la primera falta, ello

comentarios degradantes, desagradables, chistes de doble sentido y conducta análoga, será objeto de sanciones disciplinarias que pueden incluir el despido, ciertamente, no limitan estas sanciones disciplinarias al despido del empleado.

podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo la seguridad, el orden y la eficiencia que constituye el funcionamiento de la empresa.[111] En ese sentido, al evaluar si el despido del recurrido estuvo justificado, tenemos que ponderar la seriedad, la gravedad y la naturaleza de la conducta desplegada por el recurrido. Específicamente, tenemos que evaluar si el recurrido al instalar una cámara de video oculta en la oficina de la señora Rivera Meléndez para observarla subrepticiamente, reflejó una conducta intrusiva, ofensiva, ilegal y grave que atentaba en contra del derecho a la intimidad que albergaba la señora Rivera Meléndez. Asimismo, tenemos que determinar si tal conducta laceró la paz y el buen orden de la empresa. Adelantamos que de acuerdo con el derecho aplicable y la prueba desfilada,[112] Indulac demostró que medió justa causa para el despido del recurrido.[113]

En el recurso ante nos, Indulac expone en sus primeros tres señalamientos de error que los foros recurridos erraron al determinar que el *Laudo de Arbitraje* se emitió conforme

---

[111] Véase *Rivera v. Pan Pepín*, supra, pág. 690; *Delgado Zayas v. Hosp. Int. Med. Avanzada*, supra.

[112] La evidencia presentada en la *Vista de Arbitraje* por Indulac fue la siguiente:(1) el *Convenio Colectivo* suscrito entre las partes; (2) la *Carta de Despido* del señor Vargas Taveras*;* (3) la *Cámara de Video* que instaló el recurrido en la oficina de la señora Rivera Meléndez y que fue ocupada por la empresa; (4) una *Declaración Jurada de* la señora Rivera Meléndez en la cual narra los incidentes de hostigamiento, acecho e invasión a la privacidad por parte del recurrido; y (5) la *Política de Hostigamiento Sexual* de la empresa. Como parte de su prueba testifical, Indulac presentó el testimonio tanto de la señora Rivera Meléndez como el de la Sra. Nancy Santiago, Directora de Recursos Humanos.

[113] Petición de *certiorari*, pág. 14.

a derecho y que el patrono no presentó evidencia suficientemente convincente para justificar el despido. Además, esboza que, aun partiendo de la premisa de que el Árbitro estableció determinaciones de hechos en el *Laudo de Arbitraje*, estos elementos fácticos justificaban el despido inmediato del señor Vargas Taveras. Particularmente, señala que quedó establecido y probado que el señor Vargas Taveras instaló una cámara de video escondida en la oficina de la señora Rivera Meléndez para observarla subrepticiamente.[114] Asimismo, sostiene que esta conducta es descabelladamente ilegal y violatoria de los derechos de la señora Rivera Meléndez porque, además de constituir acecho y hostigamiento sexual, conformaba una crasa invasión a su privacidad.[115] También, arguye que ese acto expone al patrono a riesgos legales sustanciales si no toma las medidas necesarias para detenerla. Señala que un patrono que no tome medidas medulares en un caso como este se expone a reclamaciones de hostigamiento laboral y violación a la privacidad.[116] De igual forma, arguye que constituiría una imprudencia o negligencia crasa del patrono esperar la reiteración de la conducta del señor Vargas Taveras.

Por otra parte, la Unión sostiene que, de acuerdo con el laudo emitido por el Árbitro, este fue conforme a derecho.[117] Arguye que el Árbitro tomó una determinación que

---

[114] Íd., pág. 19.
[115] Íd., pág. 21.
[116] Íd., pág. 23.
[117] Alegato de la parte recurrida, pág. 10.

fue sostenida ampliamente por la evidencia sustancial que surge del expediente y que la prueba testifical y documental presentada no fue lo suficientemente persuasiva como para permitirle concluir que el señor Vargas Taveras hubiera incurrido en la conducta imputada y, por lo tanto, que el despido estuvo justificado.[118] En esencia, alega que fueron evidentes las deficiencias de esta prueba, así como las deficiencias de los testimonios vertidos y controvertidos de las testigos del patrono.

No cabe duda de que los empleados albergan un legítimo derecho a la intimidad en su lugar de trabajo, que la sociedad está dispuesta a reconocer, pues el lugar de empleo es donde la mayoría de los ciudadanos pasan gran parte de sus vidas.[119] Más aun, albergan una mayor expectativa a la intimidad cuando se trata de su oficina, ya que es un espacio con características íntimas del empleado, que además de recoger las destrezas y habilidades profesionales, también guarda aspectos muy personales.[120] Es por esta razón que en nuestro ordenamiento jurídico, al

---

[118] Íd.

[119] *Rosa Maisonet v. Asem*, supra. Véase también, *Vega et al. v. Telefónica*, supra, pág. 602; Soc. de Gananciales v. Royal Bank de P.R., 145 DPR 178, 202 (1998); *Arroyo v. Rattan Specialties, Inc.,* supra, pág. 75.

[120] Ahora bien, la situación podría ser diferente si se trata de una oficina abierta al público o a otros empleados, a un grado que no pudiese ser razonable albergar una expectativa de intimidad. Véase *State v. Bonnell*, 75 Haw. 124, 143-144 (1993). ("Privacy does not require solitude…[E]ven "private" business offices are often subject to the legitimate visits of coworkers, supervisors, and the public, without defeating the expectation of privacy unless the offices is "so open to fellow employees or the public that no expectation of privacy is reasonable.").

igual que en el federal,[121] se han establecido limitaciones al uso de sistemas de vigilancia en los centros de trabajos.[122] También, hemos sido enfáticos al disponer que "en aras de proteger la dignidad del trabajador, un patrono no debe establecer un sistema de vigilancia electrónica sin darle previa notificación a los empleados de su implementación, excepto en casos en que circunstancias apremiantes lo requieran".[123] Es decir, los patronos tienen la obligación de cerciorarse de cumplir con estas limitaciones para evitar lacerar el derecho de la intimidad de los trabajadores.[124] En vista de estas limitaciones y

---

[121] A estos efectos, en el ámbito federal en 1986 se aprobó el *Electronic Communication Privacy Act* (ECPA) 18 U.S.C. secs. 2510-2520 (en síntesis, esta ley penaliza a cualquier persona que intencionalmente intercepte, use o divulgue cualquier comunicación oral, telefónica o electrónica). Véase también, O'Connor v. Ortega, 480 U.S. 709 (1987)(aquí, el Tribunal Supremo de Estados Unidos resolvió que un empleado público tenía una expectativa razonable de intimidad en áreas como su propio escritorio o los lugares donde guarda expedientes). Véase además, J.E. Gruber, *Re: Electronic Monitoring the Workplace: Common Law & Federal Statutory Protection*, 651 PLI/Lit. 477 (2001).

[122] Las razones que podrían esgrimir los patronos para instalar el sistema de cámaras de video en el empleo, son las siguientes:

> (a) seguridad, (b) reducir o prevenir incidencia de sabotaje o robos, (c) evaluar la efectividad o el nivel de productividad del empleado, o (d) evaluar el trato que se le da al consumidor o cliente en el negocio. Luego de este análisis inicial, se podrá evaluar (1) cuán intrusivo es el método escogido por el patrono en la intimidad del empleado *vis-à-vis* el propósito y la necesidad de la vigilancia; (2) las características particulares del lugar de empleo, como por ejemplo, si es un espacio abierto o cerrado, y la facilidad de acceso a éste; (3) las funciones de los empleados observados; (4) la función de las facilidades que son objeto de vigilancia; (5) las capacidades técnicas y de sofisticación del equipo instalado, y (6) la publicación, notificación y utilización que haga el patrono del sistema, entre otras.

*Vega et al. v. Telefónica*, supra, pág. 609.

[123] Íd.

[124] No obstante, estas limitaciones no se pueden interpretar en un contexto amplio o inflexible que propendan a lacerar el derecho del

como corolario a esta normativa, **<u>sería una diáfana violación al derecho a la intimidad permitir que un empleado instale una cámara de video en la oficina de otro empleado para observarlo subrepticiamente</u>**.

Precisamente, la señora Rivera Meléndez alegó que su intimidad fue violada por las actuaciones del señor Vargas Taveras al colocar una cámara en su oficina para vigilarla.[125] Esta declaró que se sentía dolida y frustrada, además de sentirse hostigada por lo que había hecho el recurrido.[126] Todo este testimonio ——incluyendo lo relacionado a la conducta del señor Vargas Taveras al ser confrontado por la señora Rivera Meléndez y la Directora de Recursos Humanos—— fue vertido sin ser controvertido por la Unión.[127] A la luz de esas circunstancias, y al evaluar si se cumplen con los criterios esbozados para argumentar una violación al derecho a la intimidad ——entiéndase con el

---

patrono a proteger su propiedad privada *vis à vis* el derecho a la intimidad del empleado en el lugar de trabajo. Es decir, en este tipo de controversias hay que hacer un análisis caso a caso sobre la razonabilidad de la expectativa de intimidad del empleado.

[125] *Declaración Jurada*, Apéndice de la Petición de *certiorari*, págs. 106-107. En lo pertinente, la señora Rivera Meléndez declaró que:

> .    .    .    .    .    .    .    .
> 21. Debido a toda esta situación me siento ansiosa y temo por mi seguridad ante las actuaciones del Sr. Victor Vargas hacia mi persona.
>
> 22. Si me encuentro con el Sr. Victor Vargas nuevamente me pondré muy nerviosa y temeré por mi seguridad.
>
> 23. Siento que mi intimidad fue violada por las actuaciones del Sr. Victor Vargas al colocar una cámara en mi oficina para vigilarme.

[126] Íd.
[127] *Vista de Arbitraje*, Apéndice de la Petición de *certiorari*, pág. 203.

criterio objetivo y subjetivo— contestamos en la afirmativa. Como consecuencia de la conducta del señor Vargas Taveras, la señora Rivera Meléndez se sintió acechada, dolida y frustrada ante la invasión a su privacidad. Estos son sentimientos que tienden a predominar cuando se atenta contra la dignidad de una persona, circunstancia que satisface el criterio subjetivo en el análisis del derecho a la intimidad. Además, el señor Vargas Taveras, instaló una cámara de video oculta en la oficina de la señora Rivera Meléndez para observarla subrepticiamente, lo cual atentó contra el derecho a la intimidad que alberga un empleado dentro de su oficina. Reiteradamente hemos advertido sobre nuestro rechazo a que los avances tecnológicos se utilicen en perjuicio del derecho a la intimidad, de la integridad personal y de la dignidad individual que albergan las personas.[128] A la luz de todas estas circunstancias, es evidente que se satisface el criterio objetivo ante una violación a la expectativa de intimidad.

En vista de lo anterior, concluimos que la conducta desplegada por el recurrido fue tan lesiva que atentó contra la paz y el buen orden de la empresa. En ese sentido, hubiera constituido una imprudencia por el patrono esperar su reiteración para separar al empleado del establecimiento. Por lo tanto, era una obligación de

---

[128] *López Tristant v. Maldonado,* supra, pág. 854.

Indulac, como patrono responsable, asegurar la integridad y seguridad de la señora Rivera Meléndez. Al concluir de otra manera estaríamos permitiendo alterar el buen y normal funcionamiento del lugar de trabajo.[129]

Así las cosas, consideramos que se cumplen con los criterios para declarar nulo el *Laudo de Arbitraje*.[130] Es decir, la decisión del Árbitro es contraria en derecho porque el despido del recurrido estuvo justificado bajo los preceptos de la Ley Núm. 80, *supra*. Sin duda alguna, el señor Vargas Taveras exhibió una conducta tan lesiva que quebrantó los principios de mayor resguardo y jerarquía en nuestra Constitución, es decir, el derecho a la intimidad y a la dignidad. Como consecuencia resolvemos que el despido estuvo justificado.

## IV

Por los fundamentos expuestos, revocamos tanto la determinación del Tribunal de Apelaciones, como la

---

[129] Además, no descartamos que en situaciones similares a la de autos pudiera argumentarse que esto constituye un acecho. Sin embargo, los elementos para probarlo no fueron desarrollados en los foros inferiores y resulta innecesario discutirlo dado que la decisión que emitimos declara el despido como uno justificado.

[130] Por otro lado, Indulac señala que erró el Tribunal de Primera Instancia al determinar que el Negociado utilizó el estándar de revisión adecuado. Consideramos que sí se cometió este error. El estándar de prueba que constató el Árbitro en su *Laudo de Arbitraje* fue el de "más allá de duda razonable" y "prueba robusta y convincente". Sin embargo, aunque el Tribunal de Primera Instancia correctamente sostuvo que el estándar de prueba aplicable al presente caso es preponderancia de la prueba, sorpresivamente concluyó, que al interpretar el *Laudo de Arbitraje* se podía razonablemente concluir que el Árbitro utilizó el estándar adecuado. Evidentemente no entendemos ese proceder, cuando se desprende claramente del *Laudo de Arbitraje* la aplicación de un estándar de prueba equivocado. Reiteradamente hemos establecido que los casos de despido injustificado al amparo de la Ley Núm. 80 se requiere utilizar el estándar de evidencia de preponderancia de la prueba.

*Sentencia* del Tribunal de Primera Instancia y, a su vez, el *Laudo de Arbitraje* del Negociado de Conciliación y Arbitraje. En consecuencia, reconocemos que la violación al derecho a la intimidad por parte de un empleado a otro en el contexto laboral es razón suficiente para su despido como primera falta grave bajo la Ley Núm. 80, *supra*.

Se dictará sentencia de conformidad.


Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| INDULAC<br><br>Peticionaria<br><br>v.<br><br>ENTRAL GENERAL DE TRABAJADORES<br><br>Recurrida | CC-2019-887 |

**SENTENCIA**

En San Juan, Puerto Rico, a 4 de junio de 2021.

Por los fundamentos expuestos en la Opinión que antecede, la que se hace formar parte íntegra de la presente Sentencia, revocamos tanto la determinación del Tribunal de Apelaciones, como la Sentencia del Tribunal de Primera Instancia y, a su vez, el Laudo de Arbitraje del Negociado de Conciliación y Arbitraje. En consecuencia, reconocemos que la violación al derecho a la intimidad por parte de un empleado a otro en el contexto laboral es razón suficiente para su despido como primera falta grave bajo la Ley Núm. 80, *supra*.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo.

La Jueza Presidenta Oronoz Rodríguez emite una Opinión concurrente. El Juez Asociado señor Estrella Martínez emite una Opinión de conformidad en parte y disidente en parte. El Juez Asociado señor Colón Pérez hace constar que se une a la Opinión Concurrente emitida por la Jueza Presidenta Oronoz Rodríguez.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


INDULAC

   Peticionaria

      v.                         CC-2019-0887

CENTRAL GENERAL DE
TRABAJADORES

   Recurrida



Opinión concurrente que emitió la Jueza Presidenta Oronoz Rodríguez a la que se une el Juez Asociado señor Colón Pérez



En San Juan, Puerto Rico, a 4 de junio de 2021.

El despido del Sr. Víctor Vargas Taveras (señor Vargas Taveras) se justificó de manera plena. Esconder una cámara en la oficina de la Sra. Carmen Rivera Meléndez (señora Rivera Meléndez), su compañera de trabajo, y realizar comentarios desagradables y ofensivos al exponer las razones -o, más bien, excusas- para incurrir en tal conducta, evidencian una desviación de carácter severa la cual era lesiva a la paz y al buen orden de la empresa. Esto, de por sí, era suficiente para validar su despido. En otras palabras: su menosprecio por la dignidad y el derecho a la intimidad de su compañera de trabajo, su trato discriminatorio hacia esta, y el efecto adverso que ello tuvo en el ambiente de trabajo exigían la

separación de su puesto. Ante la gravedad de su conducta, esperar por su repetición, para entonces despedirlo, trasciende la imprudencia.

Ahora bien, no puedo suscribir la opinión mayoritaria, ya que discrepo del análisis que se realizó para validar la procedencia del despido. Específicamente, la conducta del señor Vargas Taveras --contrario a la conclusión de la Mayoría-- sí constituyó hostigamiento sexual pues "[e]l hostigamiento sexual es, ante todo, una de las manifestaciones típicas de la violencia de género, reflejo de discrimen y de desigualdad". Hernández Vélez v. Televicentro, 168 DPR 803, 832-833 (2006) (Op. Disidente J. Rodríguez Rodríguez). Según este Tribunal ha reconocido, al igual que el Tribunal Supremo de los Estados Unidos, el hostigamiento sexual es una modalidad de discrimen por razón de género. Bajo ese palio procedía analizar los hechos y el derecho en este caso. Véase Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-54 (1998). Me preocupa, entonces, el despacho somero de la interrogante de si el patrono probó que el hostigamiento sexual fue una de las causas del despido bajo la política de la empresa. Un análisis integrado de los comentarios del señor Vargas Taveras, las motivaciones para ocultar la cámara y el acto, propiamente, de haberla ocultado, hubiera permitido concluir que el hostigamiento sexual se cometió.

Además, conforme resolvió este Tribunal en Rosa Maisonet v. ASEM, 192 DPR 368 (2015), era innecesario analizar si la conducta del señor Vargas Taveras constituyó hostigamiento sexual bajo la Ley Núm. 17, infra, para

determinar si el despido estuvo justificado. En este caso, el patrono no tenía que probar un caso *prima facie* de hostigamiento sexual contra el señor Vargas Taveras para despedirlo, ya que su actuación <u>violó las normas de hostigamiento sexual de la empresa y estas contemplaban el despido como sanción</u>.

I

Aunque la Opinión mayoritaria resume los hechos, a continuación, reseño algunos datos esenciales.

El 29 de junio de 2015 Indulac, el patrono del señor Vargas Taveras, lo despidió de su empleo. Fundamentó su determinación en la querella interna que presentó la señora Rivera Meléndez, también empleada, en contra del señor Vargas Taveras. Indicó que el 14 de mayo de 2015, luego de que esta regresó de su periodo de almuerzo, encontró al señor Vargas Taveras en su oficina. Este solía frecuentar su oficina pues, según la señora Rivera Meléndez percibía, existía una relación profesional de carácter cordial entre ambos. La señora Rivera Meléndez se percató de que un gabinete ubicado detrás de su escritorio estaba fuera de lugar. Al inquirirle al señor Vargas Taveras al respecto, este le indicó que se le había caído un bolígrafo debajo del gabinete y que movió el mueble para buscarlo. Le expresó además que, como este era muy pesado, no pudo devolverlo a su lugar.

Así, el señor Vargas Taveras abandonó la oficina de la señora Rivera Meléndez. Esta regresó a sus labores, pero la cercanía entre el gabinete y la silla de su escritorio no le permitían trabajar cómodamente. Por consiguiente,

decidió intentar devolver el gabinete a su lugar. Fue entonces cuando se percató de una extensión color roja que estaba enchufada. Al tirar de esta para descubrir a dónde estaba conectado el otro extremo de la extensión, cayó una cámara de una planta ornamental que se encontraba al lado izquierdo del escritorio y de la silla. Minutos después, el señor Vargas Taveras entró nuevamente a la oficina de la señora Rivera Meléndez. Esta le preguntó si reconocía la extensión roja y la cámara. El señor Vargas Taveras admitió que las había colocado en la oficina. Luego de que el empleado le indicó que la extensión era para conectar un radio y que la ocultación de la cámara era una broma, la señora Rivera Meléndez inquirió cuáles eran las razones verdaderas para esconder una cámara en su oficina. El señor Vargas Taveras le contestó que era para saber si ella era la que estaba diciendo que ella y otro empleado eran "chillos". Luego indicó que era porque en el lugar de trabajo estaban diciendo que ella y él -la señora Rivera Meléndez y el señor Vargas Taveras- eran "chillos". La señora Rivera Meléndez se sintió ofendida. Además, se sintió nerviosa pues el señor Vargas Taveras se le acercó en ocasiones múltiples para intentar recuperar la cámara. Ante ello, le solicitó al señor Vargas Taveras que abandonara su oficina. Este lo hizo solo después de que ella, a preguntas de él, le contestó que lo perdonaba, con el fin de que se fuera de allí.

Luego de que el señor Vargas Taveras salió de la oficina, la señora Rivera Meléndez informó al patrono. Indulac investigó los hechos y determinó despedir al señor

Vargas Taveras, según le comunicó en una carta. Esta leía: "La presente es para informarle que estamos prescindiendo de sus servicios como empleado de esta empresa. La misma obedece a la querella sometida de la Sra. Carmen Rivera, en la modalidad de invasión a la privacidad, acecho y hostigamiento".

Tras su despido, el señor Vargas Taveras, a través de la unión laboral que lo representaba, presentó una querella sobre despido injustificado bajo la Ley Núm. 80, infra, la cual se refirió a arbitraje, en conformidad con el convenio colectivo que regía entre las partes. Tras celebrarse la vista correspondiente, donde Indulac fue el único que presentó prueba, el árbitro emitió un laudo en el que concluyó que el despido del señor Vargas Taveras fue injustificado. Indulac presentó una petición de impugnación de laudo de arbitraje ante el Tribunal de Primera Instancia. El foro primario confirmó el laudo. El patrono recurrió entonces al Tribunal de Apelaciones, el cual denegó expedir el auto de certiorari de Indulac. Finalmente, Indulac compareció ante este Tribunal.

II

De entrada, hay que tener presente que la controversia del caso se circunscribe a determinar si Indulac tenía justa causa para despedir al señor Vargas Taveras de su empleo. El caso no es sobre hostigamiento sexual bajo la Ley Núm. 17 de 22 de abril de 1988, conocida como "Ley para Prohibir el Hostigamiento Sexual en el Empleo" (29 LPRA sec. 155 et seq.) (Ley Núm. 17), sino sobre despido injustificado bajo la Ley Núm. 80 de 30 de mayo de 1976, conocida como "Ley

sobre Despidos Injustificados" (29 LPRA sec. 185(a) et seq.) (Ley Núm. 80). Ahora bien, Indulac identificó como una de las causas para el despido que el empleado incurrió en hostigamiento sexual. A eso fines, aportó como evidencia su política de hostigamiento sexual, la cual define qué es hostigamiento sexual en el empleo e incluye una lista no taxativa de actos constitutivos de hostigamiento sexual. En lo pertinente, esta política establece como actos de hostigamiento sexual terminantemente prohibidos "acercamientos y/o proposiciones de naturaleza sexual incluyendo **comentarios degradantes, desagradables**, chistes de doble sentido **y conducta análoga**". (Énfasis suplido). De igual forma, la política dispone que cualquier supervisor o empleado que la viole será objeto de sanciones disciplinarias **las cuales pueden incluir el despido.**

La Mayoría lo reconoce en una nota al calce de la Opinión.[131] Sin embargo, lo desatiende y se enfoca en determinar -al igual que los foros recurridos- si los comentarios que el señor Vargas Taveras hizo a la señora Rivera Meléndez constituyeron hostigamiento sexual en su modalidad de ambiente hostil, al amparo de la Ley Núm. 17, supra. Por consiguiente, aunque reconoce discretamente que la conducta del señor Vargas Taveras podía constituir una violación a la política de hostigamiento sexual de Indulac, resuelve que no hubo hostigamiento sexual. Bajo su análisis, los comentarios que el empleado dirigió hacia su compañera de trabajo y la ocultación de la cámara no satisfacían los

---

[131] Véase nota al calce número 110 de la Opinión mayoritaria.

requisitos estatutarios y jurisprudenciales para catalogar esa conducta como hostigamiento sexual en la modalidad de ambiente hostil. El enfoque de la Mayoría es errado por dos razones.

En primer lugar, ante unos hechos similares, este Tribunal resolvió en Rosa Maisonet v. ASEM, supra, que un patrono no tiene que probar un caso *prima facie* de hostigamiento sexual contra un empleado bajo la Ley Núm. 17, supra, para despedirlo por incumplir las normas de hostigamiento sexual de su lugar de trabajo. Basamos nuestra determinación en que la Ley Núm. 17, supra, solo provee unas guías mínimas y le confiere a cada patrono discreción para adoptar las normas que estime necesarias para cumplir con el deber que le impone el estatuto: tomar aquellas medidas que necesite para prevenir, prohibir y erradicar el hostigamiento sexual en el empleo. Íd., págs. 382 y 383. Por consiguiente, al definir lo que constituye hostigamiento sexual, dijimos que un patrono puede ir más allá de los parámetros que establece la Ley Núm. 17. Íd., pág. 373.

Este caso no trata de hostigamiento sexual bajo la Ley Núm. 17, supra. Indulac adoptó una política de hostigamiento sexual amplia y reconoció el despido como una posible sanción ante su violación. Por lo tanto, la modalidad de hostigamiento sexual en la que incurrió el señor Vargas Taveras no era determinante para dirimir la corrección legal de su despido. Íd., págs. 389-390. Lo único que controla los hechos es si este violó la política de hostigamiento sexual de la empresa y si tal violación daba pie a su

despido. Como discutiré, contrario a lo que concluyó la Mayoría, el señor Vargas Taveras efectivamente incurrió en hostigamiento sexual ya que violentó la política de hostigamiento sexual de Indulac. Ello, sin más, justificaba su despido.

En segundo lugar, el análisis de la Mayoría es incorrecto, pues evalúa los comentarios que hizo el señor Vargas Taveras y el acto de ocultar la cámara en su oficina como eventos separados e inconexos. La Mayoría se equivoca, pues existía una correlación evidente entre ambos sucesos y el patrono los tomó en cuenta --ambos-- al determinar que el señor Vargas Taveras incurrió en hostigamiento sexual y despedirlo. Además, el acercamiento dispositivo de la Mayoría trivializa los comentarios que el señor Vargas Taveras dirigió a la señora Rivera Meléndez. Para la Mayoría, los pretextos del señor Vargas Taveras para justificar ocultar una cámara en la oficina de su compañera (y así vigilar y comprobar si la señora Rivera Meléndez estaba diciendo en la planta que eran "chillos") son simplemente expresiones incisivas y desagradables que no constituyen un acercamiento o conducta de naturaleza sexual. Bajo su raciocinio, el uso de la palabra "chillos" -aún es este contexto- es insuficiente para establecer el hostigamiento sexual. Tampoco es suficiente el hecho de instalar una cámara en la oficina de su compañera de trabajo, porque según su análisis el empleado despedido lo

hizo únicamente "para verificar cierta información".[132] No coincido.

En este caso, conforme a su reglamentación interna, el patrono concluyó que el señor Vargas Taveras incurrió en conducta constitutiva de hostigamiento sexual. El empleado violó la política de hostigamiento sexual de Indulac al realizar comentarios -cuando menos- degradantes y desagradables, al revelar a la señora Rivera Meléndez las razones que lo llevaron a ocultar una cámara en su oficina. A través de esos comentarios, el empleado insinuó que su compañera de trabajo estaba teniendo una relación sentimental con una persona fuera de su relación marital. Particularmente, insinuó que la señora Rivera Meléndez tenía o decía tener un "chillo". Esa conducta indeseable violó la dignidad de la señora Rivera Meléndez por ser mujer. Resulta difícil no ver la connotación sexual en ese tipo de expresiones y lo desagradable y ofensivas que resultan, tal como lo percibió la señora Rivera Meléndez. Por lo tanto, los comentarios del señor Vargas Taveras violentaron la política de hostigamiento sexual de su patrono, la cual catalogaba como un acto de hostigamiento sexual "acercamientos y/o proposiciones de naturaleza sexual incluyendo **comentarios degradantes, desagradables**".

Pero más allá de eso, esas expresiones también revelaban que el acto de esconder la cámara igualmente contravino la política de hostigamiento sexual de Indulac. Mediante sus comentarios, el empleado reveló a la señora

---

[132] Íd., pág. 36.

Rivera Meléndez que escondió una cámara en su oficina para descubrir asuntos de su vida personal, particularmente de su vida sentimental y con quién la compartía. En otras palabras, la ocultación de la cámara estuvo motivada por el deseo del señor Vargas Taveras de conocer detalles íntimos de la señora Rivera Meléndez, no meramente por su interés de "verificar cierta información", como concluye la Mayoría. No solo eso, sino que el empleado consideraba que este hecho justificaba esconder una cámara en la oficina de su compañera para vigilarla, como si tuviese algún derecho sobre su persona para conocer esos detalles. Al juzgar estos hechos desde una perspectiva de género detectamos una evidente relación asimétrica de poder que nos lleva a pensar que el señor Vargas Taveras no hubiese colocado una cámara en la oficina de otro hombre para indagar sobre lo mismo.[133]

En consideración a lo anterior, es difícil escapar la conclusión de que el trato discriminatorio en que el señor Vargas Taveras incurrió para con su compañera de trabajo también fue contrario a la política de hostigamiento sexual de Indulac. Adviértase que, además de identificar como un acto de hostigamiento sexual "acercamientos y/o proposiciones de naturaleza sexual", la empresa enumeró como ese tipo de acto cualquier "conducta análoga" a esa. De esa manera, el patrono, sin pretender ser exhaustivo en cuanto a lo que constituía un acto de hostigamiento sexual, amplió su definición con el fin de cubrir otras conductas

---

[133] Protocolo para Juzgar con Perspectiva de Género: Haciendo Realidad el Derecho a la Igualdad, Elementos para la Aplicación de la Perspectiva de Género en el Juzgar, pp. 90-92, Suprema Corte de la Nación de México, 2015.

no enumeradas expresamente, pero de naturaleza similar. Nótese que ello era una forma de cumplir a cabalidad su obligación de prevenir, prohibir y erradicar el hostigamiento sexual en el empleo. Así, si bien la instalación de la cámara oculta no constituyó un acercamiento o una proposición sexual explícita, fue un acto de hostigamiento sexual, pues es una conducta análoga según la tipifica Indulac.[134] Esto es así porque, al instalar una cámara oculta en la oficina de la señora Rivera Meléndez, el señor Vargas Taveras pretendió descubrir intimidades de su compañera de trabajo, particularmente sobre con quién se relacionaba íntimamente.

Por consiguiente, ante las violaciones a la política de hostigamiento sexual, Indulac podía imponerle el despido como sanción primera, según lo contempla la política. Así lo debió concluir la Mayoría, en lugar de resolver que no se constituyó hostigamiento sexual en la modalidad de ambiente hostil y que el despido estuvo justificado, únicamente, porque el señor Vargas Taveras violentó el derecho a la intimidad de la señora Rivera Meléndez.

Aclaro que esconder una cámara en la oficina de la señora Rivera Meléndez --de por sí-- era lo suficientemente grave como para justificar el despido del señor Vargas Taveras. Esto es, independiente de que tal actuación violentara o no las normas de hostigamiento sexual del patrono. Tal y como expuso la Mayoría, la señora Rivera

---

[134] Incluso, en otras jurisdicciones se considera que utilizar equipos o programas tecnológico para acosar, vigilar o perseguir a una persona, constituyen abuso tecnológico, una modalidad de violencia de género. Véase WomensLaw.org, proyecto de la Red Nacional para Eliminar la Violencia Doméstica, Inc. (NNEDV, por sus siglas en inglés).

Meléndez tenía una expectativa razonable de intimidad en su oficina. La ocultación de una cámara para observarla de forma subrepticia, atentó contra esa intimidad y, en consecuencia, contra su dignidad. Esta actuación justificó, por demás, el despido, aun cuando era la primera falta del empleado. Sin embargo, el que este violentara la política de hostigamiento sexual de Indulac abona a su gravedad y fortalece la corrección legal -por no decir, el imperativo- de despedir al señor Vargas Taveras.

En resumidas cuentas, el señor Vargas Taveras atentó contra la dignidad e intimidad de su compañera de trabajo al instalar una cámara oculta en su oficina. Su conducta violentó la política de hostigamiento sexual de Indulac: (a) al incurrir en este acto aborrecible; y (b) al articular las razones para su conducta. Tal cuadro denota que era inescapable concluir que el despido del señor Vargas Taveras se justificó.

Escapa el entendimiento y sorprende que los foros inferiores arribaran a un resultado contrario. Determinar que Indulac no tenía justa causa para despedir al señor Vargas Taveras implica aseverar que el patrono tenía que permitir que el empleado permaneciera en el lugar de trabajo, a pesar de la gravedad de su conducta, y que la señora Rivera Meléndez, a pesar de lo que vivió, tenía que seguir trabajando al lado de su hostigador, como si nada. Ningún patrono tiene que tolerar que los miembros de su fuerza laboral instalen cámaras ocultas en las oficinas de sus compañeros o compañeras, de la misma forma que ningún empleado o empleada tiene que tolerar esa conducta hacia su

persona. Máxime cuando esa actuación involucra un elemento de hostigamiento sexual y discrimen por razón de género, el cual es lesivo al derecho a la dignidad e igualdad de toda persona. Los foros inferiores estaban ante un caso patentemente claro, el cual justificaba la imposición de la única medida disciplinaria que eliminaría cualquier posibilidad de que esa conducta se repitiera: el despido.

Por las razones expuestas, estoy de acuerdo con la procedencia del despido, mas no puedo estarlo con que se descarte tan livianamente el hostigamiento sexual que sufrió la señora Rivera Meléndez a manos del señor Vargas Taveras.

Maite D. Oronoz Rodríguez
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Indulac<br><br>Peticionario<br><br>v.<br><br>Central General de Trabajadores<br><br>Recurrido | CC-2019-0887 | <br><br><br><br>Certiorari |

Opinión de conformidad en parte y disidente en parte emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 4 de junio de 2021.

Estoy conforme con el paso significativo que tomó este Tribunal en la protección del derecho a la intimidad dentro del ámbito laboral. Sin embargo, considero que debimos dar un paso adicional y no desaprovechar una oportunidad idónea para precisar y reforzar las protecciones estatutarias de las que se valen las víctimas de hostigamiento sexual en el empleo para reclamar sus derechos. Por tal razón, me veo en la obligación de impartir mi conformidad parcialmente y disentir en torno a la inaplicabilidad de las protecciones contra el ambiente hostil, así descartadas por una Mayoría de este Tribunal.

I

De entrada, es imprescindible destacar la trascendencia de la decisión que este Tribunal tomó con respecto al derecho a la intimidad, pues, por primera vez, se reconoce que éste se extiende a la relación entre compañeros y compañeras en la esfera laboral. Ello tiene un valor inestimable en las dimensiones tanto constitucionales como laborales, por cuanto aporta al desarrollo de más protecciones a la dignidad del ser humano en cada una de sus facetas. Es por ello que, nuevamente, hago hincapié en mi conformidad cabal con tal determinación.

No obstante, mi criterio diverge del de la Mayoría categóricamente con respecto al análisis de si, en este caso, estuvieron presentes los requisitos estatutarios para configurarse un hostigamiento sexual en su modalidad de ambiente hostil. Bajo el propio prisma del razonamiento Mayoritario, es mi posición que la totalidad de las circunstancias, examinadas a la luz del derecho que impera, demuestran inequívocamente que, al colocar una cámara en la oficina de su compañera de trabajo y expresar su interés en confirmar la existencia de relaciones extramaritales, el Sr. Víctor Vargas Taveras (señor Vargas Taveras) creó un ambiente hostil para la Sra. Carmen Rivera Meléndez (señora Rivera Meléndez).[135] Me explico.

---

[135]Resulta no menos sorprendente que echemos por la borda también el reconocimiento pautado en Rosa Maisonet v. ASEM, 192 DPR 368 (2015), cuya aplicación en este caso igualmente conduciría a justificar el despido del Sr. Víctor Vargas Taveras.

Como se sabe, el hostigamiento sexual por vía de un ambiente hostil se establece cuando la conducta "tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando **crea un ambiente de trabajo intimidante, hostil u ofensivo**". (Énfasis suplido). 29 LPRA sec. 155b. Conforme lo ha establecido este Tribunal, la pregunta de umbral en reclamaciones de esta naturaleza es si la conducta fue lo suficientemente **severa y ofensiva** para alterar las condiciones del empleo y crear un ambiente abusivo para la víctima. Ortiz González v. Burger King de Puerto Rico, 189 DPR 1, 20-21 (2013); Rodríguez Meléndez v. Sup. Amigo, Inc., 126 DPR 117, 132 (1990). Tal pregunta se contesta mediante el análisis de: la naturaleza de la conducta alegada; su frecuencia e intensidad; el contexto en el cual ocurre; el período de tiempo y su extensión, y la conducta y las circunstancias personales de la alegada víctima. Íd.

Tras estudiar con minuciosidad los hechos de este caso, resultaba imperativo concluir que el acto de colocar una cámara secreta en la oficina de una compañera de trabajo para observarla subrepticiamente, conforme reconoce la Mayoría, la cual es a su vez descubierta por la propia víctima, crea un ambiente ofensivo, intimidante y humillante. Esto sólo se agrava al recordar las razones que proveyó el señor Vargas Taveras para justificar la instalación de la cámara en la oficina de la señora Rivera Meléndez. Sin embargo, la Opinión mayoritaria pauta que, a pesar de que éstas fueron "incisivas

y desagradables",[136] además de "incómodas e indeseadas",[137] no se puede concluir que las mismas constituyeron un hostigamiento sexual, pues la palabra "chillos" no configura un acercamiento o conducta sexual.

Al respecto, es importante recordar que, en ocasiones previas, este Tribunal ha pautado que "[n]o es necesario […] hacer insinuaciones específicas de índole sexual, utilizar vocabulario que tenga connotaciones sexuales o algún tipo de contacto físico para que se configure el hostigamiento sexual en el empleo". In re Robles Sanabria, 151 DPR 483, 506 (2000). Esto, pues, "[l]a justiciabilidad de una reclamación por ambiente hostil no requiere que dicha conducta produzca un daño económico y tampoco es indispensable que ésta sea de naturaleza explícitamente sexual; **basta con que el hostigamiento o trato desigual se dirija a la persona únicamente por razón de su género**". (Énfasis suplido). Ortiz González v. Burger King de Puerto Rico, supra, pág. 20.

A mi juicio, ambos componentes de la conducta del señor Vargas Tavera, a saber, tanto las expresiones como el acto mismo de colocar la cámara, y los cuales no deben desasociarse el uno del otro, cumplen con tal requisito. Veamos.

Al momento de los hechos, el señor Vargas Taveras intentó justificar la instalación de la cámara al indicar que "estaban diciendo en la planta que [otro empleado] y [la

---

[136]Opinión del Tribunal, pág. 35.

[137]Íd.

señora Rivera Meléndez] [eran] 'chillos'".[138] Al ser confrontado por la señora Rivera Meléndez, éste inmediatamente retractó tal explicación y sostuvo que su intención fue "verificar si era [la señora Rivera Meléndez] la que estaba diciendo por la planta que [el señor Vargas Taveras] y [la señora Rivera Meléndez] [eran] 'chillos'".[139] Más allá de la connotación sexual intrínsecamente atada a tales expresiones, el contexto en el cual surgieron estas excusas hace innegable que las mismas son ofensivas y están directamente dirigidas a aspectos medulares del género de la señora Rivera Meléndez. Es impermisible reducir tales expresiones por parte del señor Vargas Taveras a un mero interés en conocer "cierta información" cuando, precisamente, la información que intenta obtener está relacionada a asuntos íntimos y privados de la vida sexual de una compañera de trabajo.

Sin embargo, aun desvinculado de expresión alguna, el acto mismo de colocar una cámara secreta para espiar a una compañera de trabajo en la privacidad de su oficina representa, indiscutiblemente, un hostigamiento dirigido al género de la víctima. A mi parecer, tal conclusión no es especulativa. Por consiguiente, la totalidad de las circunstancias obliga a concluir que se configuró un hostigamiento sexual en su modalidad de ambiente hostil.

---

[138]Declaración Jurada, Apéndice de Petición de certiorari, pág. 106.

[139]Íd.

A su vez, resulta obvio que se trató de un acto **no bienvenido** que incidió de manera irrazonable en el desempeño laboral de la señora Rivera Meléndez. Rodríguez Meléndez v. Sup. Amigo, Inc., supra, pág. 162. Esto, pues según he señalado, se trata de conducta que repercute sobre el desempeño al punto de amilanar al empleado a permanecer o a acudir a sus labores y entorpecer sus funciones y progreso en el empleo. Velázquez Ortiz v. Mun. de Humacao, 197 DPR 656, 680 (2017) (Estrella Martínez, Opinión de Conformidad y Disidente). Nótese que la señora Rivera Meléndez dejó su empleo seis (6) meses después de los hechos, en diciembre de 2015.[140] Pero, más importante aún, según se desprende de las propias declaraciones de la señora Rivera Meléndez, la conducta del señor Vargas Taveras afectó su condición emocional de forma severa. Recuérdese, parte del análisis judicial exige determinar si la "conducta degradante" provocó en la víctima "tal ansiedad y [ha] debilitado su estima propia y confianza, [o ha] contaminado impermisiblemente las condiciones del empleo". Rodríguez Meléndez v. Sup. Amigo, Inc., supra, pág. 132.

En ese sentido, conforme a su Declaración Jurada, la señora Rivera Meléndez describió que, al momento de los hechos, estaba "nerviosa, asustada y ansiosa".[141] Añadió que temió por su seguridad y acudió al Tribunal de Primera Instancia para tratar de procurar una orden de acecho en

---

[140]Transcripción de la vista, pág. 151, línea 10.

[141]Declaración Jurada, Apéndice de Petición de certiorari, pág. 106.

contra del señor Vargas Taveras.[142] De hecho, indicó que, mientras suscribía la Declaración Jurada, todavía se sentía ansiosa y temía por su seguridad, particularmente ante la idea de encontrarse con el señor Vargas Taveras nuevamente. Esto, pues, su proximidad en el lugar de empleo la hizo sentir que no podría trabajar tranquila, toda vez que estaría nerviosa y con temor por su seguridad y bienestar.[143] La señora Rivera Meléndez concluyó su declaración afirmando que **"[n]o me siento segura de trabajar en la planta si el [señor Vargas Taveras] está trabajando también allí"**.[144] (Énfasis suplido).

Asimismo, durante la vista de arbitraje, la señora Rivera Meléndez hizo eco de sus expresiones en la Declaración Jurada y se describió durante el incidente como "asustada" y "nerviosa".[145] Añadió que "temía por [su] seguridad"[146] y que "tenía miedo" de tener que seguir trabajando con el señor Vargas Taveras.[147] Expresó, además, que se **sintió hostigada**, tanto por la instalación de la cámara en su oficina[148] como por los comentarios del señor Vargas Taveras.[149] Como cuestión

---

[142]Íd.

[143]Íd.

[144]Íd., pág. 107.

[145]Transcripción de la vista, Apéndice de Petición de certiorari, pág. 200, líneas 10-12.

[146]Íd., pág. 201, líneas 8-9.

[147]Íd., pág. 202, líneas 1-2.

[148]Íd., pág. 213, líneas 6-9.

[149]Íd., pág. 202, línea 9.

de hecho, ésta explicó que se sintió dolida "como mujer" porque los comentarios del señor Vargas Taveras atacaron su reputación intachable e hicieron referencia a conducta inapropiada.[150]

Por otra parte, según la Sra. Nancy Santiago, Directora del Departamento de Recursos Humanos de la Indulac y quien también testificó durante la vista, la señora Rivera Meléndez le indicó que, tras los hechos, estaba muy asustada, "que no podía trabajar en la planta estando él […] en el mismo espacio donde ella estaba trabajando"[151] y que se sintió hostigada.[152]

De estas declaraciones se desprende diáfanamente que la prueba testifical demostró cómo la instalación de la cámara y las expresiones subsiguientes del señor Vargas Taveras interfirieron negativamente con el ambiente laboral de la señora Rivera Meléndez. En sus propias palabras, la señora Rivera Meléndez describió sentirse insegura y temerosa en su entorno profesional, como también incapaz de cumplir con sus responsabilidades laborales de tener que trabajar cerca del señor Vargas Taveras. Asimismo, la situación resultó tan intimidante, ofensiva y humillante que tuvo un impacto negativo en el estado emocional de la señora Rivera Meléndez, como persona y, sobre todo, como mujer. Es decir, que se reúnen todos los requisitos que este Foro ha establecido a

---

[150]Íd., pág. 207, líneas 14-19.

[151]Íd., págs. 169-170, líneas 25, 1-5.

[152]Íd., pág. 177, línea 10.

través de la jurisprudencia para configurar el hostigamiento sexual en la modalidad de ambiente hostil.[153]

Ahora bien, de ordinario, la modalidad de ambiente hostil se caracteriza por una multiplicidad de actos. In re Robles Sanabria, supra, pág. 500. Sin embargo, en Velázquez Ortiz v. Mun. de Humacao, supra, pág. 665, una Mayoría de este Tribunal reconoció que la razón para ello es que "cada acto aislado **podría** no ser lo suficientemente severo como para dar lugar a una causa de acción" por hostigamiento sexual. (Énfasis suplido). Dicho de otro modo, un sólo acto puede configurar un ambiente hostil si es de severidad suficiente. Como cuestión de derecho, así lo reconoció este Tribunal en UPR Aguadilla v. Lorenzo Hernández, 184 DPR 1001 (2012), dentro de un contexto académico universitario.[154]

---

[153]Conforme lo destacó la Jueza Asociada señora Fiol Matta en su Opinión Disidente en Umpierre v. Banco Popular, 170 DPR 205, 232 (2007):

[E]l ambiente hostil no se experimenta sólo con la cercanía física al hostigador y en la incomodidad próxima del entorno laboral. Mientras perdure la relación laboral, la ausencia física de la perjudicada de su lugar de trabajo no suprime los efectos del hostigamiento en su estado anímico y emocional *ni altera la ansiedad producto del ambiente intimidante y hostil del lugar de trabajo al cual debe regresar.* El ambiente hostil creado por el patrón de conducta hostigante **no está delimitado por un espacio físico determinado, sino que se encuentra también en un estado mental y emocional de humillación e intimidación que trasciende el lugar de trabajo.** (Énfasis suplido).

[154]En tal caso, al examinar los hechos bajo la Ley de Hostigamiento Sexual en las Instituciones de Enseñanza, Ley 3-1998, 3 LPRA sec. 149 et seq., este Tribunal adoptó un análisis dual objetivo y subjetivo, y determinó que el único incidente entre el profesor y el estudiante fue suficiente para constituir el hostigamiento sexual en su modalidad de ambiente hostil.

No pasa desapercibido que, aunque la Opinión Mayoritaria no halló probado el hostigamiento sexual, sí determinó que el despido del señor Vargas Taveras estuvo justificado debido a que su conducta violó la intimidad de la señora Rivera Meléndez. Aunque a la luz de tal conclusión el resultado hubiera sido el mismo, sostengo que las circunstancias particulares de este caso presentaban un escenario óptimo para reconocer en el ámbito laboral la configuración del ambiente hostil mediante un único acto suficientemente severo.

Reitero que el colocar una cámara para espiar a una compañera de trabajo en la privacidad de su oficina y luego justificar tal acción mediante alusiones a alegadas relaciones extramaritales de ésta, representan actos indefectiblemente dirigidos al género de la víctima y, en consecuencia, configuran el hostigamiento sexual en su modalidad de ambiente hostil. Tal conducta, además, tuvo el efecto de perturbar las emociones de la señora Rivera Meléndez, influenciar su entorno laboral e impactar su capacidad para desempeñarse en su empleo.

Determinar que este único acto fue lo suficientemente severo para configurar la modalidad de ambiente hostil evitaría que los tribunales de menor jerarquía potencialmente interpreten que actos similares a éste no representan el tipo de conducta que sanciona la política en contra del hostigamiento sexual. Aún más significativo, haber concluido que la vivencia de la señora Rivera Meléndez constituyó un hostigamiento sexual protegería de forma contundente a

aquellas víctimas que, afortunadamente, no tuvieron que verse sometidas a incidentes repetitivos o de naturaleza explícitamente sexual para que los tribunales validen su experiencia.

## II

Por los fundamentos antes expresados, estoy conforme con el análisis y el razonamiento sobre la violación al derecho a la intimidad y, en consecuencia, con la conclusión de que el despido del señor Vargas Taveras estuvo justificado. No obstante, disiento de la determinación relacionada al hostigamiento sexual por la modalidad de ambiente hostil por entender que en este caso se configuró la conducta proscrita por el ordenamiento que rige.


Luis F. Estrella Martínez
Juez Asociado